Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/22/2017 08:11 PM CST

Kelly Armstrong, appellee, v.
Clarkson College, appellant.
___ N.W.2d ___

Filed September 1, 2017.    No. S-16-717.

1. **Directed Verdict: Appeal and Error.** In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.

2. **Directed Verdict: Evidence.** A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.

3. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

4. **Contracts: Appeal and Error.** The formation and terms of an implied contract are questions of fact, which an appellate court reviews for clear error.

5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

6. **Rules of Evidence: Appeal and Error.** When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

7. **Trial: Evidence: Appeal and Error.** In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.

8. **Jury Instructions: Pleadings: Evidence.** A litigant is entitled to have the jury instructed upon only those theories of the case which

are presented by the pleadings and which are supported by competent evidence.

9. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.

10. **Jury Instructions.** Whether the jury instructions given by a trial court are correct is a question of law.

11. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.

12. ____: ____. It is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.

13. ____: ____. If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

14. **Motions for New Trial: Appeal and Error.** An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.

15. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

16. **Contracts: Parties: Intent.** An implied in fact contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract.

17. **Contracts: Parties.** The requisite mutuality for an enforceable contract is absent when one of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only.

18. **Contracts: Intent.** Where an implied in fact contract exists, its terms may be shown by the surrounding facts and circumstances giving rise to the contract, the conduct of the parties when performing under the contract, or a general reasonableness standard.

19. ____: ____. As a general matter, the terms of an implied contract are a question of fact to be determined by the jury based on the evidence presented.

20. **Pleadings.** An affirmative defense raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.

21. **Colleges and Universities: Breach of Contract.** An argument that academic deference applies to a decision of a college or university is not an affirmative defense, but instead relates to the proper standard for reviewing a plaintiff's claim for breach of contract premised on an academic judgment.

22. **Colleges and Universities: Courts.** Not every decision by an academic institution is subject to deference.

23. **Directed Verdict: Pleadings.** If there are controverted facts to support recovery upon any theory of liability pled by the plaintiff, then a directed verdict is properly denied.

24. **Contracts.** The doctrine of impossibility of performance, often now called impracticability of performance, excuses a promisor's failure to perform a duty under a contract where performance has been rendered severely impracticable or impossible by unforeseen circumstances.

25. **Contracts: Proof.** There are three general requirements for the application of the doctrine of impracticability of performance: (1) the occurrence (or nonoccurrence) of the event causing the impracticability was unexpected; (2) performance of the duty by the promisor would be extremely difficult and burdensome, if not impossible; and (3) the promisor did not assume the risk of the event's occurrence (or nonoccurrence).

26. **Contracts.** Performance of a contractual duty is not impracticable merely because it has become inconvenient or more expensive. Mere difficulty of performance is not enough.

27. ____. A promisor's duty to perform will be excused if it is the other party's conduct that makes performance impossible or impracticable.

28. **Contracts: Proof.** The party invoking the impracticability defense must show that he or she used reasonable efforts to surmount the obstacles which prevented performance.

29. **Jury Instructions: Evidence.** A tendered jury instruction is warranted by the evidence only if there is enough evidence on the issue to produce a genuine issue of material fact for the jury to decide.

30. **Damages.** A party is required only to mitigate damages that might have been avoided by reasonable efforts.

31. ____. In reviewing the reasonableness of a party's actions to mitigate damages, an appellate court often considers three factors: (1) the cost or difficulty to the plaintiff of mitigation, (2) the plaintiff's financial ability to mitigate, and (3) the defendant's actions to inhibit the plaintiff from mitigating damages.

32. **Administrative Law: Appeal and Error.** Under the doctrine of exhaustion of administrative remedies, one must generally exhaust any available administrative remedies before one can seek judicial review.

33. **Administrative Law.** The exhaustion of administrative remedies doctrine generally applies to governmental entities.
34. **Administrative Law: Appeal and Error.** The exhaustion of remedies doctrine applies in many cases to private, nongovernmental entities that provide internal administrative review procedures.
35. **Colleges and Universities: Employment Contracts.** Where an employer or university provides a mandatory grievance procedure in a contract, the enforceability of a party's rights under the contract is conditioned on the exercise of that grievance procedure.
36. **Contracts: Appeal and Error.** Mandatory grievance procedures must be exhausted before seeking judicial review, because the grievance procedure is part of the contractual bargain and defines the rights themselves.
37. **Administrative Law: Contracts: Proof.** The exhaustion of a mandatory grievance procedure in a contract is a condition precedent to enforcing the rights under that contract.

Appeal from the District Court for Douglas County: Marlon A. Polk, Judge. Reversed and remanded for a new trial.

Brien M. Welch and Kathryn J. Cheatle, of Cassem, Tierney, Adams, Gotch & Douglas, for appellant.

Jason Mario Bruno and Robert S. Sherrets, of Sherrets, Bruno & Vogt, L.L.C., for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Wright, J.

## I. NATURE OF CASE

A jury awarded Kelly Armstrong a $1 million verdict on her breach of contract claim against Clarkson College (Clarkson). Armstrong had been a student at Clarkson, but was placed on probation and then administratively withdrawn from the school by Clarkson. Clarkson appeals the district court's denial of its motion for a directed verdict, the denial of several requested jury instructions, the exclusion of evidence, and the denial of its motion for new trial. Because we conclude that the district court erred by refusing to give Clarkson's requested jury instruction on Armstrong's alleged failure to fulfill a condition

precedent by not exhausting the college's grievance procedure, we reverse, and remand for a new trial.

## II. BACKGROUND

### 1. CLARKSON'S CRNA PROGRAM

Clarkson is a nonprofit health science college located in Omaha, Nebraska. In 2010, Clarkson established a program for a master of science in nursing with a specialization in nurse anesthesia (CRNA program). After a student graduates from the program, the student can take a national examination to become a certified registered nurse anesthetist (CRNA).

The CRNA program, like other nurse anesthetist programs, has two components, didactic and clinical. Clarkson's program is "front-loaded," with the completion of the didactic portion first, followed by the clinical portion. The didactic portion, consisting of coursework, lasts 12 months. The clinical portion is completed at various clinical sites and lasts 18 months. In the clinical stage of the CRNA program, the students work at a hospital under the supervision of the hospital's CRNA staff, gaining experience in nearly every type of case a CRNA would encounter in practice. Clarkson contracts with clinical sites to provide clinical education for its students. These contracts, known as clinical affiliation agreements, outline the obligations of both Clarkson and the clinical sites.

When the events underlying this litigation occurred in 2013, Clarkson had five primary clinical sites. A primary clinical site is one where a student completes the vast majority of his or her clinical work. In 2013, Clarkson also had two rural specialty sites where a student in the CRNA program could gain experience in a rural hospital setting. These specialty sites are designed to supplement the student's clinical experience, but unlike the primary clinical sites, do not provide all of the types of experience a student needs to complete his or her clinical requirements.

In the fall of 2011, Armstrong enrolled in the CRNA program. She completed the didactic portion, earning a 3.84 grade point average. Armstrong then began the clinical phase of

the program and was assigned to the University of Nebraska Medical Center (UNMC) as her main clinical site. She then began doing a rotation at a specialty clinical site in Red Oak, Iowa.

## 2. Program Handbooks and Manuals

At trial, several of Clarkson's student handbooks and policy manuals were admitted into evidence, including: Clarkson's student handbook, the handbook for nurse anesthesia students, Clarkson's nurse anesthesia program policies and procedures manual, Clarkson's nurse anesthesia program clinical site manual, and Clarkson's grievance policy. Clarkson's Code of Conduct (Code of Conduct) is contained within its student handbook, which applies to all students, not just those in the CRNA program.

Many of the Clarkson handbooks and policies contained disclaimers that they were not contractual in nature: the CRNA program handbook states, "The information in this syllabus is intended to be informational and not contractual in nature," and the CRNA program policies and procedures manual states, "The statements contained herein are not to be regarded as an offer or contract." Clarkson's student handbook and its clinical site manual do not appear to contain contractual disclaimers. Most of the handbooks also contained clauses reserving Clarkson's right to change the policies at any time.

Also admitted was the code of ethics for the CRNA, which is adopted and promulgated by the American Association of Nurse Anesthetists (AANA). Clarkson students in the CRNA program are required to follow this code of ethics (AANA Code of Ethics) under the CRNA program handbook.

## 3. AANA Conference

When Armstrong was approximately halfway done with the clinical portion of the CRNA program, she decided to attend a national AANA conference in Washington, D.C. Armstrong testified at trial that she and Kristal Hodges, who Armstrong described as her "best friend in the program at the time,"

decided to go, because they thought the conference would be fun and would provide a break from the rigors of clinical work. The conference took place on April 14 to 17, 2013. Armstrong and Hodges were the only two students in the Clarkson CRNA program who attended this national conference.

### 4. AANA POLITICAL ACTION COMMITTEE POTOMAC CRUISE FUNDRAISER

The AANA conference was 4 days long, Sunday through Wednesday. The conference on Sunday featured discussions on the legislative and political issues facing the nurse anesthetist profession. Hodges arrived on Saturday, the day before the conference, while Armstrong arrived on Sunday afternoon. The two stayed in the same hotel room.

On Sunday night, AANA's political action committee hosted a fundraiser event for the conference attendees. The fundraiser was a boat cruise on the Potomac River. The attendees were instructed to wear either professional attire or dress for the event's 1980's theme. Many members of the Nebraska Association of Nurse Anesthetists and Nebraska CRNA's were in attendance at the fundraiser.

Conference attendees were provided bus transportation to the fundraiser boat ride. Alcohol was served at the fundraiser; the attendees were given two drink tickets, and glasses of champagne were offered to them as they arrived on the boat.

Armstrong testified that she consumed only four alcoholic drinks on the cruise. She testified that she used her two drink tickets for two beers, but did not remember finishing her champagne. She said that Timothy Glidden, the chief CRNA at UNMC and Armstrong's clinical supervisor, bought her a beer as did another individual. Armstrong estimated that the fundraiser lasted about 4 hours.

### 5. BUS RIDE

After the fundraiser ended, the attendees were transported by bus back to the hotel. The bus was filled with conference and fundraiser attendees, including many from Nebraska. Also

on the bus was Nancy Gondringer, the federal political director and past president of the Nebraska Association of Nurse Anesthetists and a member of the "Small States Committee" of the AANA. Glidden was on the bus, as was another UNMC CRNA and also a Clarkson CRNA instructor. Dennis Bless, the then-incoming president of the AANA, was also on the bus. Other students in CRNA programs and CRNA's from Nebraska and other states rode on the bus as well.

There was some conflict in the witnesses' testimony at trial about what happened on the bus ride. Armstrong testified that she got on the bus and took a seat near Bless. She said that she and Bless were joking about the 1980's costumes that some were wearing as part of the fundraiser's theme. Hodges was seated behind her. Armstrong said that she asked for the fake moustache that Bless had as part of his 1980's costume and then stood up and turned around to Hodges, placed the moustache on her stomach, just below her belly button, and made a joke about a term used to reference ungroomed pubic hair. Armstrong said that she had used the term in the past as a nickname for Hodges or to tease her and that it was an "inside joke" between the two about Hodges' being single, because "if you're going to go out and start dating, you better clean that up." Armstrong testified that she told Bless that ungroomed pubic hair could have been part of her 1980's-themed costume, after which she obtained his fake moustache to make her joke.

Other witnesses, such as Hodges, Gondringer, and Glidden, gave a slightly different account. They testified that Armstrong held her pants down near her pubic symphysis, with the moustache just above her pants, walking up and down the aisle of the bus, saying things like, "Look at my [ungroomed pubic hair]," and "[t]his is how yours looks like" to Hodges. Hodges, Gondringer, and Glidden told Armstrong to stop several times, after which she eventually sat down. But Armstrong testified that the other witnesses' accounts of her behavior were "exaggerated quite a bit."

### 6. Probation

#### (a) Return From Conference

As Armstrong was en route home from the conference, Hodges called Armstrong because she was concerned that Armstrong had missed her flight because she did not wake up in time that morning. According to Hodges, when they spoke over the telephone, Armstrong told Hodges that Hodges did not know how to have fun and was "too uptight." They argued about what had happened at the conference. Hodges told Armstrong that Armstrong may be in some trouble with Clarkson, because "[t]here were so many people there" and "[s]omebody's going to say something."

Dr. Mary Hoversten, the director of Clarkson's CRNA program, soon received word of the incident on the fundraiser bus ride. The day the conference ended, about 3 days after the incident, Hoversten received a telephone call from Hodges, informing her about the incident. Hodges was emotional on the call and told Hoversten that Armstrong's behavior was unprofessional and very embarrassing to her. The next morning, Hoversten informed her supervisor of the situation and they decided to meet with Armstrong when she returned. Hoversten spoke to Armstrong over the telephone and told her not to return to her specialty clinical site, but to return to Clarkson's campus for a meeting. According to Hoversten, Armstrong acknowledged during the call that her behavior was unprofessional and that she was sorry about it.

Hoversten spoke with Glidden over the telephone. Glidden described what he had observed on the bus ride and that he thought Armstrong's behavior was unprofessional and inappropriate. He said that he was not sure whether Armstrong would be allowed back at UNMC, her main clinical site. Hoversten also called Gondringer about the incident on the bus ride.

#### (b) April 23, 2013, Meeting

On April 23, less than a week after the conference ended, Armstrong had a meeting at Clarkson. In attendance at the meeting were Armstrong; Hoversten; Dr. Tony Damewood, the

vice president of operations for Clarkson; and the vice president of academic affairs. Armstrong brought an attorney to the April 23 meeting. According to Armstrong, her attorney was not allowed in the meeting by Damewood, who made him wait in the hallway.

The decision was made to place Armstrong on probation for violating the AANA Code of Ethics and the CRNA program handbook. Armstrong was told at the meeting that she would not be able to return to her specialty clinical site due to the rule in the CRNA program handbook that students on clinical probation cannot work at specialty clinical sites. According to Hoversten's notes from the meeting, the possibility that her clinical site may not allow her to return due to the incident was discussed.

Damewood, who was not a part of the CRNA program, was present at the April 23 meeting because of his role in Clarkson's student assistance program. Damewood told Armstrong at the meeting that she had violated the Clarkson Code of Conduct. The Code of Conduct is a part of the Clarkson student handbook, applicable to all Clarkson students, not just the students in the CRNA program. The Code of Conduct has different procedural requirements for student discipline than the procedures for placing a student on clinical probation under the CRNA program handbook. Damewood said at trial that, in retrospect, he did not believe that Armstrong violated the Code of Conduct. Damewood never told Armstrong that he was incorrect to state that her conduct violated the Code of Conduct. No charges were ever filed against Armstrong under the Code of Conduct.

### (c) April 24, 2013, Meeting

The next day, April 24, the academic progression committee met to formally notify Armstrong that she was being placed on probation and discuss the probation terms. Present at the meeting were Armstrong, Hoversten, and Dr. Ann Glow, the assistant director of the CRNA program. The notes from the meeting state that another faculty member and two

UNMC clinical coordinators were absent and would be briefed on the meeting.

At the April 24 meeting, Armstrong was given a formal notice by Hoversten that she was being placed on probation. The general plan for probation was discussed. The tentative plan was for Armstrong to return to her primary clinical site, UNMC, pending the approval of Glidden. Armstrong was told of UNMC's right to terminate her clinical experience. The plan, if UNMC did not allow her to return, was that Clarkson would "make a reasonable attempt to place [Armstrong] in an alternative site. . . . If this is unsuccessful, [Armstrong] will be given the option to withdraw from the program or be terminated. [Armstrong] is made aware of [Clarkson's] Student Grievance Policy . . . ."

Hoversten told Armstrong that she was being placed on probation due to a violation of rule 3.4 of the AANA Code of Ethics, which states that "[t]he CRNA is responsible and accountable for his or her conduct in maintaining the dignity and integrity of the profession." Armstrong was given a copy of this portion of the AANA Code of Ethics.

Also discussed at the meeting was the CRNA program handbook rule regarding practice and professional ethics. The rule regarding professionalism states that "[s]tudents shall conduct themselves in a professional and respectable manner during class time, clinical time and during professional meetings and seminars." The subpart of the professionalism rule related to practice and professional ethics incorporates the AANA Code of Ethics and makes it applicable to students in the Clarkson CRNA program:

> The program expects students to adopt and observe the AANA Code of Ethics. Violations of this ethical conduct standard will be regarded as professional and academic misconduct and failure to meet clinical performance objectives, and be subject to review as such.
>
> If a student is found to be noncompliant with this policy disciplinary actions will be taken, up to and/or including dismissal from the Program.

Additionally, the CRNA program handbook's probation policy and dismissal procedure was discussed. That provision distinguishes between academic probation and clinical probation. A student must, at a minimum, be placed on clinical probation for certain reasons, including "[f]ailure to comply with the AANA ethical code of conduct." It also states that a student may be dismissed from the program for failing to comply with the AANA Code of Ethics. Armstrong was also given a copy of this portion of the CRNA program handbook.

The program's withdrawal and grievance policies were also discussed with Armstrong. The grievance policy allows students to grieve a complaint that "a specific decision or action that affects the student's academic record or status has violated published policies and procedures, or has been applied to the grievant in a manner different from that used for other students." The policy details the procedure for filing a grievance, including that grievances must be filed no later than 7 days after the incident in question. Grievances are heard by a grievance committee, which is composed of five members: an academic council member, a faculty member from the faculty senate executive committee, a student representative, a director from student services, and the vice president of academic affairs (who votes only in case of a tie vote), each of which must be without conflicts of interest. The policy states that "[t]he Grievance Committee is the designated arbiter of disputes within the student community in cases, which do not involve a violation of the Student Code of Conduct . . ." and that "[d]ecisions made by the Grievance Committee and/or [vice president of academic affairs] shall be final." Armstrong was provided a copy of the grievance procedure and a grievance form.

Armstrong was given a copy of the withdrawal policy in the CRNA program handbook by Hoversten so that if she were unable to progress in the program, she could withdraw from the program and reapply at another program without having a dismissal on her academic record. Armstrong was also provided a copy of the CRNA program handbook policy

on time off during the program, which states that during the clinical phase, students are allowed only 25 days of planned or unplanned absences.

Armstrong agreed to the terms of the probation. She testified that she felt like she had no choice but to agree to the probation "because there was no other option. I felt like the other option would be you're done, like, you can't go on any further, so there was really no choice."

### (d) April 25, 2013, Meeting

Another meeting was held on April 25 with Armstrong, Hoversten, and Glow. Hoversten learned earlier that day that Glidden and UNMC's CRNA education committee had unanimously decided not to allow Armstrong back at UNMC. Glidden said at trial that he had a patient safety concern based on what he observed of Armstrong's behavior on the Washington, D.C., trip. Hoversten told Armstrong that she would try to find her another clinical site. Hoversten and Glow told Armstrong that they were her advocates.

Hoversten sent emails to the CRNA program's other primary clinical sites to see if they would be willing to take Armstrong. These emails were substantially similar and read:

> I have a situation with a student. She has recently been put on probation due to misconduct. Her primary clinical site has made the decision not to allow her to return as a [CRNA program student]. Her problems are behavioral not academic. This is not a patient safety issue.
>
> As her program director, I am making every effort to reassign her to another site. If you feel you have enough room for a second senior Clarkson student and your group would be willing to take this on, please call me at your earliest convenience. If not, let me know so I can move forward with this search.

Hoversten also spoke to some of the clinical site representatives over the telephone. After receiving Hoversten's communications, all of the clinical sites declined to take Armstrong. Hoversten said that she felt obligated to be honest with the

clinical sites that Armstrong was on probation, but also wanted to let them know that Armstrong posed no risk to patient safety and did not have any academic problems.

Hoversten testified that she could not have opened a new clinical site to accommodate Armstrong, as Armstrong requested, because the process of approving a new site would take 6 months to a year. Hoversten also could not have allowed Armstrong to return to her specialty clinical rotation temporarily, because under the clinical probation policy in the CRNA program handbook, students may not be on a specialty clinical rotation while on clinical probation. Hoversten testified that she could not extend the program and put her in a clinical site because that would take up a clinical spot reserved for someone in the class behind her.

### 7. ADMINISTRATIVE WITHDRAWAL

After all of Clarkson's clinical sites refused to take Armstrong, she was without a clinical site. Under the CRNA program handbook, students are allowed a total of 25 absences during their clinical phase. Soon, Armstrong had run out of allowed absences. Hoversten told her that she needed to withdraw from the CRNA program, as was the plan under the probation terms if another clinical site could not be found. Armstrong was not willing to withdraw.

On May 9, Hoversten spoke with the Clarkson registrar about withdrawing Armstrong from the program. Rather than dismissing Armstrong, Hoversten administratively withdrew her from the program. Hoversten was told by the registrar that Armstrong's academic record would show that she withdrew, but would not show whether it was a student dismissal or an administrative dismissal. Hoversten testified that by administratively withdrawing Armstrong rather than dismissing her, she was trying to help her in case she wanted to apply to another program.

### 8. LAWSUIT AND TRIAL

Armstrong sued Clarkson for breach of contract. Before trial, the district court granted Armstrong's motion in limine

to exclude any reference at trial to a prior incident of alleged plagiarism involving Armstrong. For purposes of the motion, the court admitted an "Academic Honesty Conference Form." According to the form, Armstrong's "senior project [was] a continuation of a previous student's project. [Armstrong] submitted the first section of her paper in which the majority was identical to the former student's paper, including the entire literature review." Under the student comments, it states, "It was my thought that by taking over another student's project I was continuing where it left off. I now understand this was wrong . . . ." She was allowed to start her coursework over with a new assignment schedule. Armstrong stated in her deposition that she did not commit plagiarism and that the incident was a misunderstanding.

At the jury instruction conference, Clarkson requested a jury instruction on failure to fulfill a condition precedent, which the district court denied. Clarkson claimed that Armstrong failed to fulfill a condition precedent by failing to take advantage of Clarkson's grievance procedure before filing a lawsuit.

Clarkson also requested a jury instruction on impossibility of performance, which the district court denied. Clarkson argued that the actions of Armstrong and the clinical sites made it impossible to perform its obligation to provide a clinical site for Armstrong.

The district court allowed Clarkson to amend its pleading to conform to the evidence on the issue of mitigation of damages. But the district court denied Clarkson's requested jury instruction on mitigation of damages. Clarkson argued that Armstrong could have mitigated her damages by reapplying to Clarkson or other CRNA programs.

The jury returned a verdict for Armstrong in the amount of $1 million.

After trial, Clarkson moved to set aside the verdict or, in the alternative, moved for a new trial. The motion was based on the district court's failure to grant Clarkson's motion for directed verdict at the close of Armstrong's case in chief and

at the close of her rebuttal, the district court's failure to give Clarkson's requested jury instructions, and other grounds. The district court denied the motion.

Clarkson then brought this appeal. We granted Clarkson's petition to bypass the Nebraska Court of Appeals.

## III. ASSIGNMENTS OF ERROR

Clarkson assigns several errors. They are, restated, that the district court (1) erred in not granting its motion for directed verdict, because there was no evidence that it acted arbitrarily and capriciously; (2) abused its discretion in excluding evidence of Armstrong's plagiarism; (3) erred by not instructing the jury on Armstrong's alleged failure to fulfill a condition precedent by not exhausting the school's internal grievance procedure; (4) erred by not instructing the jury on the affirmative defense of "impossibility of performance"; (5) erred by not instructing the jury on Armstrong's alleged failure to mitigate her damages; and (6) erred in not granting Clarkson's motion to set aside the verdict or for a new trial for the above errors.

## IV. STANDARD OF REVIEW

[1,2] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[1] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[2]

---

[1] *Winder v. Union Pacific RR. Co.*, 296 Neb. 557, 894 N.W.2d 343 (2017).

[2] *Id.*

[3,4] An appellate court independently reviews questions of law decided by a lower court.[3] The formation and terms of an implied contract are questions of fact, which an appellate court reviews for clear error.[4]

[5-7] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[5] When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[6] In a civil case, the admission or exclusion of evidence is not reversible error unless it unfairly prejudiced a substantial right of the complaining party.[7]

[8-13] A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.[8] To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[9] Whether the jury instructions given by a trial court are correct is a question of law.[10]

---

[3] *Donut Holdings v. Risberg*, 294 Neb. 861, 885 N.W.2d 670 (2016).

[4] See, *City of Scottsbluff v. Waste Connections of Neb.*, 282 Neb. 848, 809 N.W.2d 725 (2011); *K.M.H. v. Lutheran Gen. Hosp.*, 230 Neb. 269, 431 N.W.2d 606 (1988).

[5] *Pierce v. Landmark Mgmt. Group*, 293 Neb. 890, 880 N.W.2d 885 (2016).

[6] *Id.*

[7] *Id.*

[8] *RM Campbell Indus. v. Midwest Renewable Energy*, 294 Neb. 326, 886 N.W.2d 240 (2016).

[9] *Id.*

[10] *Anderson v. Union Pacific RR. Co.*, 295 Neb. 785, 890 N.W.2d 791 (2017).

When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[11] However, it is not error for a trial court to refuse a requested instruction if the substance of the proposed instruction is contained in those instructions actually given.[12] If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[13]

[14,15] An appellate court reviews a denial of a motion for new trial or, in the alternative, to alter or amend the judgment, for an abuse of discretion.[14] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[15]

## V. ANALYSIS

### 1. Denial of Clarkson's Motion for Directed Verdict

We first address Clarkson's assertion that the district court erred in not granting its motion for directed verdict. The parties do not dispute that there was a contractual relationship between them, but Clarkson asserts that its actions were subject to academic deference such that no breach occurs unless its actions are arbitrary and capricious. It argues it was entitled to judgment as a matter of law because there was no evidence it acted arbitrarily and capriciously in its actions leading to Armstrong's damages.

---

[11] *Id.*

[12] *United Gen. Title Ins. Co. v. Malone*, 289 Neb. 1006, 858 N.W.2d 196 (2015).

[13] *Id.*

[14] *Cisneros v. Graham*, 294 Neb. 83, 881 N.W.2d 878 (2016).

[15] *Hartley v. Metropolitan Util. Dist.*, 294 Neb. 870, 885 N.W.2d 675 (2016).

[16] A contract may be express, implied, written, or oral.[16] An implied in fact contract arises where the intention of the parties is not expressed in writing but where the circumstances are such as to show a mutual intent to contract.[17] We conclude that the relevant terms of the contract between Clarkson and Armstrong are implied.

[17] It is clear that the Clarkson student handbooks do not express in writing the relevant terms of the contract between Clarkson and Armstrong. Where an employee handbook expressly states that it creates no contractual obligations, we have refused to treat it as creating any such obligations.[18] Moreover, the requisite mutuality for an enforceable contract is absent when one of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only.[19]

Clarkson's CRNA program handbook, which Clarkson concluded Armstrong violated and under which she was placed on probation, states that "[t]he statements contained herein are not to be regarded as an offer or contract." It further states that "[t]he information in this syllabus is intended to be informational and not contractual in nature" and that Clarkson "reserves the right to amend, alter, change, or modify the provisions of this syllabus at any time and in any manner . . . ." Similar language is found in many of Clarkson's other handbooks. Because these student handbooks both expressly state they create no contractual obligations and they reserve to

---

[16] *Fast Ball Sports v. Metropolitan Entertainment*, 21 Neb. App. 1, 835 N.W.2d 782 (2013).

[17] *Donut Holdings v. Risberg, supra* note 3.

[18] See *Hillie v. Mutual of Omaha Ins. Co.*, 245 Neb. 219, 512 N.W.2d 358 (1994).

[19] See, *id.*; *Millien v. Colby College*, 874 A.2d 397 (Me. 2005) (holding in similar case that while contractual relationship existed between student and university, student handbook was not enforceable contract because of its reservation clause that allowed university power to unilaterally alter its terms).

Clarkson the power to alter the provisions of the handbooks at any time and in any manner, the relevant terms of the contract between Clarkson and Armstrong are implied.

[18,19] Where an implied in fact contract exists, its terms may be shown by the surrounding facts and circumstances giving rise to the contract, the conduct of the parties when performing under the contract, or a general reasonableness standard.[20] And, as a general matter, the terms of an implied contract are a question of fact to be determined by the jury based on the evidence presented.[21]

Clarkson argues that all its actions relevant to Armstrong's claimed damages constituted academic judgments that are entitled to deference. Academic deference is given to the expert evaluation of cumulative information involved in academic decisionmaking.[22]

For several reasons, Armstrong asserts that the academic deference standard does not apply in this case. Alternatively, Armstrong argues that the deferential standard for academic judgments constitutes an affirmative defense that was waived and that there was evidence from which the jury could have concluded that Clarkson's actions were arbitrary and capricious.

[20,21] We find no merit to Armstrong's claim that the deferential standard was an affirmative defense. An affirmative defense raises a new matter which, assuming the allegations in the petition to be true, constitutes a defense to the merits of a claim asserted in the petition.[23] Clarkson's argument about

---

[20] See, *Linscott v. Shasteen*, 288 Neb. 276, 847 N.W.2d 283 (2014); *City of Scottsbluff v. Waste Connections of Neb., supra* note 4; *K.M.H. v. Lutheran Gen. Hosp., supra* note 4.

[21] See, *City of Scottsbluff v. Waste Connections of Neb., supra* note 4; *K.M.H. v. Lutheran Gen. Hosp., supra* note 4.

[22] See, *Doe v. Board of Regents*, 287 Neb. 990, 846 N.W.2d 126 (2014); *Doe v. Board of Regents*, 283 Neb. 303, 809 N.W.2d 263 (2012); *Doe v. Board of Regents*, 280 Neb. 492, 788 N.W.2d 264 (2010).

[23] *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

the deferential standard applicable to academic judgments does not raise a new matter, but instead relates to the proper standard for reviewing a plaintiff's claim for breach of contract premised on an academic judgment.[24]

We also reject Armstrong's assertion that academic deference applies only to state-run universities and only to due process rather than contract claims. In *Doe v. Board of Regents*,[25] we held that a university's academic judgments are entitled to substantial deference in a breach of contract claim contesting the medical school's academic evaluation of the plaintiff's professionalism while performing his residency, and its ultimate decision of dismissal. Virtually all authorities hold that deference is due the academic judgments of colleges and universities in contract claims, regardless of whether the institution is private or public.[26]

[22,23] But it does not follow that every decision by an academic institution is subject to deference. The parties' arguments on appeal illustrate that although courts extend academic

---

[24] See cases cited *supra* note 22.

[25] *Doe v. Board of Regents, supra* note 22, 283 Neb. 303, 809 N.W.2d 263 (2012).

[26] See *Chang v. Purdue University*, 985 N.E.2d 35, 47 (Ind. App. 2013) (holding in breach of contract claim against university arising from dismissal of student for unprofessional behavior that "[o]ur sole function when reviewing disciplinary actions such as in the present case is to determine whether the educational institution acted illegally, arbitrarily, capriciously, or in bad faith"). See, also, *Mangla v. Brown University*, 135 F.3d 80 (1st Cir. 1998); *Doe v. Brown University*, 209 F. Supp. 3d 460 (D.R.I. 2016); *Holert v. Univ. of Chicago*, 751 F. Supp. 1294 (N.D. Ill. 1990); *Seitz-Partridge v. Loyola University*, 409 Ill. App. 3d 76, 948 N.E.2d 219, 350 Ill. Dec. 150 (2011); *Abdullah v. State*, 771 N.W.2d 246 (N.D. 2009); *Kashmiri v. Regents of University of Cal.*, 156 Cal. App. 4th 809, 67 Cal. Rptr. 3d 635 (2007); *Raethz v. Aurora University*, 346 Ill. App. 3d 728, 805 N.E.2d 696, 282 Ill. Dec. 77 (2004); *Harwood v. Johns Hopkins*, 130 Md. App. 476, 747 A.2d 205 (2000); *Tedeschi v. Wagner Coll.*, 49 N.Y.2d 652, 404 N.E.2d 1302 (1980); *Lexington Theological Seminary v. Vance*, 596 S.W.2d 11 (Ky. App. 1979). See, generally, Annot., 47 A.L.R.5th 1 (1997).

deference to some disciplinary judgments involving specialized academic or professional expertise, when such expertise comes into play is often less than clear.[27] Regardless of whether the deferential standard applies to Clarkson's other decisions, we find that academic deference does not apply to its failure to provide Armstrong with a clinical site. And if there are controverted facts to support recovery upon any theory of liability pled by Armstrong, then the directed verdict was properly denied.[28]

One of the theories presented by Armstrong in her complaint, and on which the jury was instructed, was that Clarkson breached its contract with Armstrong by failing to provide her with a clinical site or the necessary clinical training to complete the CRNA program. Armstrong testified that prior to enrolling at Clarkson, Hoversten told her that Clarkson had affiliation agreements with different clinical sites and told her that she would be able to obtain the clinical hours she needed to graduate. Hoversten testified at trial that Clarkson was obligated to provide Armstrong with a clinical site as part of the program.

We conclude that Clarkson did not "actually exercise professional judgment"[29] when it failed to provide Armstrong with a clinical site. Clarkson does not argue that it prevented

---

[27] See, generally, 47 A.L.R.5th, *supra* note 26.

[28] See, *MacDonald Engineering Company v. Hover*, 290 F.2d 301 (8th Cir. 1961); *Byrd v. Delasancha*, 195 S.W.3d 834 (Tex. App. 2006); *Gill Const., Inc. v. 18th & Vine Authority*, 157 S.W.3d 699 (Mo. App. 2004); *Springer v. Haugeberg, Rueter, Stone & Gowell*, 124 Or. App. 2, 860 P.2d 912 (1993); *Atkins v. City Finance Co.*, 683 S.W.2d 331 (Tenn. App. 1984); *Campbell v. Brinson*, 89 Ariz. 197, 360 P.2d 211 (1961).

[29] See *Raethz v. Aurora University, supra* note 26, 346 Ill. App. 3d at 732, 805 N.E.2d at 699, 282 Ill. Dec. at 81 ("a court may not override the academic decision of a university 'unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment,'" quoting *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985)).

Armstrong from obtaining a clinical site for some academic reason or as punishment for her misconduct. Quite the opposite, Clarkson argues in another assignment of error that its ability to provide a clinical site was rendered impossible by the clinical sites' decisions not to take Armstrong. That is, Clarkson argues that Armstrong's inability to obtain a clinical site was not Clarkson's decision, but the decision of the clinical sites. Clarkson is certainly not entitled to deference for a decision that it claims it did not make.

Clarkson and Armstrong disagree about Clarkson's contractual duty to provide a clinical site. The disagreement is whether the duty was a one-time duty that Clarkson performed when it initially provided Armstrong with her clinical site at UNMC or was an ongoing duty throughout the duration of Armstrong's time in the program, such that Clarkson had a duty to find her a different clinical site once UNMC refused to allow her to return when she was placed on probation.

The terms of that duty were a question for the jury. The jury could have reasonably concluded that Clarkson's duty was ongoing and that it breached its duty when it failed to provide her a clinical site after she was placed on probation and UNMC refused to allow her to return there.

Additionally, the jury could have concluded that Clarkson failed to take reasonable steps to find Armstrong another clinical site in accord with the terms of her probation. At trial, Armstrong testified that she agreed to the terms of her probation, and the jury could have reasonably found that these terms modified the contract between Clarkson and Armstrong. Broadly speaking, the terms were: Armstrong would return to her primary clinical site, UNMC, if allowed back by UNMC; Clarkson would "make a reasonable attempt" to place her at another clinical site if UNMC did not allow her back; and if no site were found, she would either withdraw or be dismissed from the program. The notes from the initial meeting state that if UNMC would not allow Armstrong to return, "Hoversten would do everything she can to retain a clinical site within reason."

The jury could have concluded that Clarkson failed to make a reasonable attempt or failed to do everything it could within reason to find Armstrong another site. While Clarkson made some attempts to obtain a site for Armstrong after UNMC refused to allow her back—sending an email to its other clinical sites and making some telephone calls—whether these efforts were reasonable was a question for the jury. The jury could have reasonably concluded that Clarkson's efforts were not reasonable.

We need not decide in this appeal whether Clarkson's determination of the nature and type of professionalism that is required of nurse anesthetists and its CRNA program students, and its determination that Armstrong should be placed on probation, is the type of academic judgment to which courts should defer. Neither do we need to determine whether reasonable minds could have differed as to whether Clarkson acted arbitrarily and capriciously in determining that Armstrong acted unprofessionally and that her actions warranted probation. The district court did not err in denying Clarkson's motion for directed verdict, because the jury could have rendered a verdict for Armstrong based on Clarkson's failure to provide her with a clinical site, an action that under the facts of this case was entitled to no deference.

## 2. Exclusion of Clarkson's Evidence of Armstrong's Alleged Plagiarism

Clarkson argues that the district court erred by granting Armstrong's motion in limine to exclude evidence of Armstrong's alleged plagiarism. It argues that the plagiarism was a part of the res gestae of its decision to place Armstrong on probation, which led to her administrative withdrawal. Armstrong argues that this evidence was properly excluded because it is not relevant and would be unfairly prejudicial. We conclude that the district court did not abuse its discretion in excluding evidence of the alleged plagiarism.

In a pretrial deposition, Hoversten said that Armstrong's inability to progress in the program was "the only reason why

she was withdrawn." But at trial, Clarkson made an offer of proof that if allowed to testify, "Hoversten would be able to explain the issues concerning plagiarism and the reason why that entered in to her ultimate decisions with respect to [Armstrong]."

One of the reasons for the exclusion of the plagiarism evidence advanced by Armstrong in her pretrial motion in limine and on appeal is that it would violate Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). Under rule 403, evidence, even if relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[30]

Here, there is no question that allegations of plagiarism would carry a risk of unfair prejudice. The allegation could significantly affect the jury's evaluation of Armstrong's credibility. And the evidence presented at trial affirmatively shows that the alleged plagiarism, which Armstrong contends was a misunderstanding, played a minimal role, if any, in Clarkson's decision to discipline Armstrong. Moreover, Hoversten testified in her pretrial deposition that Armstrong's inability to progress in the program was the only reason for her dismissal, in contradiction to the offer of proof made at trial. The evidence of the alleged plagiarism carried little or no probative value and a significant risk of unfair prejudice. Under these circumstances, we conclude that the district court did not abuse its discretion in excluding evidence of Armstrong's alleged plagiarism.

### 3. DENIAL OF CLARKSON'S REQUESTED JURY INSTRUCTIONS

Clarkson assigns error to the district court's refusal to give three of its proposed jury instructions. Clarkson's tendered jury instructions on the impossibility of Clarkson's performance,

---

[30] See, generally, *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

Armstrong's alleged failure to mitigate her damages, and Armstrong's alleged failure to fulfill a condition precedent.

To establish reversible error from a court's failure to give a requested jury instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction was warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the requested instruction.[31]

### (a) Impossibility of Performance

Clarkson argues that the district court erred in not giving its proffered jury instruction on impossibility of performance. Clarkson argues that Armstrong's conduct and the clinical site's refusal to accept her made it impossible for Clarkson to perform its duties under the contract. Armstrong argues that Clarkson's performance was not impossible, because it should not have disciplined her in the first place, and that it could have demanded that UNMC allow her back, done a better job advocating for her to other clinical sites, or allowed her to stay at her specialty clinical site temporarily. We conclude that the district court did not err by failing to give Clarkson's jury instruction on impossibility of performance.

[24,25] The doctrine of impossibility of performance, often now called impracticability of performance, excuses a promisor's failure to perform a duty under a contract where performance has been rendered severely impracticable or impossible by unforeseen circumstances.[32] The Restatement (Second) on Contracts, § 261, entitled "Discharge by Supervening Impracticability," states:

---

[31] *RM Campbell Indus. v. Midwest Renewable Energy, supra* note 8.

[32] See, *Turbines Ltd. v. Transupport, Inc.*, 285 Neb. 129, 825 N.W.2d 767 (2013); *Cleasby v. Leo A. Daly Co.*, 221 Neb. 254, 376 N.W.2d 312 (1985); *Mohrlang v. Draper*, 219 Neb. 630, 365 N.W.2d 443 (1985). See, generally, 14 James P. Nehf, Corbin on Contracts § 74 (Joseph M. Perillo ed., rev. ed. 2001); 30 Richard A. Lord, A Treatise on the Law of Contracts by Samuel Williston § 77 (4th ed. 2004).

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.[33]

There are three general requirements for the application of the doctrine of impracticability of performance: (1) the occurrence (or nonoccurrence) of the event causing the impracticability was unexpected; (2) performance of the duty by the promisor would be extremely difficult and burdensome, if not impossible; and (3) the promisor did not assume the risk of the event's occurrence (or nonoccurrence).[34]

[26] Performance of a contractual duty is not impracticable merely because it has become inconvenient or more expensive.[35] Mere difficulty of performance is not enough.[36] As the Supreme Court of Colorado explained regarding the distinction between impossibility and mere difficulty:

> "'[T]he true distinction is not between difficulty and impossibility. A man may contract to do what is impossible . . . . The important question is whether an unanticipated circumstance has made performance of the promise vitally different from what should reasonably have been within the contemplation of both parties when they entered into the contract. If so, the risk should not fairly be thrown upon the promisor.' . . ."[37]

[27,28] A promisor's duty to perform will be excused if it is the other party's conduct that makes performance impossible

---

[33] Restatement (Second) of Contracts § 261 at 313 (1981) (cited by *Cleasby v. Leo A. Daly Co., supra* note 32).

[34] 14 Nehf, *supra* note 32, § 74.1 (Corbin on Contracts).

[35] See *Mohrlang v. Draper, supra* note 32.

[36] See *id.*

[37] *Littleton v. Emp. Fire Ins. Co.*, 169 Colo. 104, 108, 453 P.2d 810, 812 (1969).

or impracticable.[38] And the party invoking the impracticability defense must show that he or she used reasonable efforts to surmount the obstacles which prevented performance.[39]

[29] Here, Clarkson's tendered jury instruction is a correct statement of law. It is based on NJI2d Civ. 15.20, entitled "Impossibility of Performance." But Clarkson's jury instruction was not warranted by the evidence. A tendered jury instruction is warranted by the evidence only if there is enough evidence on the issue to produce a genuine issue of material fact for the jury to decide.[40] Clarkson's instruction was not warranted, because the difficulty was not unexpected and Clarkson failed to take reasonable steps to overcome the difficulty.

For the defense of impracticability of performance to apply, the event making performance impracticable must be unexpected. Here, it was not unexpected that a student might be placed on probation or that a clinical site might dismiss or refuse to accept a student. While the specific details of Armstrong's behavior might have been unexpected, it certainly was not unforeseen to Clarkson that a student might act in an unprofessional manner. Nor was it unforeseen that a student might be placed on probation. This is precisely why Clarkson

---

[38] See, *Hardin v. The Eska Co., Inc.*, 256 Iowa 371, 377-78, 127 N.W.2d 595, 598 (1964) ("the rule is well settled that one party to a contract may not hamper the efforts of the other in performance according to its terms. . . . 'Each party to a contract impliedly agrees not to prevent . . . the other party from performing or, . . . to render performance impossible by any act of his own'"); 14 Nehf, *supra* note 32, § 74.3 (Corbin on Contracts). Cf. *D & S Realty v. Markel Ins. Co.*, 284 Neb. 1, 816 N.W.2d 1 (2012) (discussing the doctrine of prevention); *Fast Ball Sports v. Metropolitan Entertainment, supra* note 16 (same).

[39] *McCalden v. California Library Ass'n*, 955 F.2d 1214 (9th Cir. 1990) (superseded by rule on other grounds as stated in *Harmston v. City and County of San Francisco*, 627 F.3d 1273 (9th Cir. 2010)); 30 Lord, *supra* note 32, § 77:8 (Williston on Contracts).

[40] See, generally, *Tapp v. Blackmore Ranch*, 254 Neb. 40, 56, 575 N.W.2d 341, 352 (1998) ("[a] litigant is entitled to have the jury instructed only upon those theories of the case which are presented by the pleadings and which are supported by competent evidence").

has rules regarding professionalism and student probation. It is also clear that it was not unforeseen to Clarkson that a clinical site might terminate or refuse to accept a student; its clinical affiliation agreement with UNMC expressly contemplates this. The agreement provides the conditions under which UNMC could terminate a student's clinical experience and provides that Clarkson would not reassign a terminated student to UNMC without approval, but that approval "will not be unreasonably withheld." Clarkson's policies and its clinical affiliation agreement unambiguously show that Armstrong's probation and the clinical sites' refusal to accept her were not unexpected. Thus, the doctrine of impracticability of performance cannot apply.

The doctrine of impracticability also does not apply because Clarkson failed to use reasonable efforts to overcome the difficulty it faced in performing its duty to provide Armstrong with a clinical site. Clarkson failed to make any attempts to enforce its rights under its clinical affiliation agreement with UNMC or any other sites in order to secure a clinical site for Armstrong. The clinical affiliation agreement gives UNMC "the right to terminate a student's clinical experience" in situations where "flagrant or repeated violations of [UNMC's] rules, regulations, policies, or procedures occur." It also allows UNMC "to take immediate action when necessary to preserve the quality of patient services and to maintain operation of its facilities free from interruption." No evidence was presented at trial that Armstrong violated any rules at UNMC, much less that she engaged in flagrant or repeated violations. Nor was any evidence presented that she posed any risk to the quality of patient services or was a risk of causing interruption at UNMC. And Hoversten stated in her emails to the other clinical sites that Armstrong was not a patient safety risk. Clarkson did not make any efforts to demand that UNMC perform its obligations under the agreement and allow Armstrong to return to complete her clinical studies.

As the party invoking the impracticability defense, Clarkson must show that it used reasonable efforts to overcome the

obstacles which prevented its performance—here, the clinical sites' refusals to accept Armstrong. Because Clarkson failed to make any efforts to enforce its rights under the clinical agreement with UNMC or with the other clinical sites, it is not entitled to a defense of impracticability based on their decisions to not accept Armstrong. We conclude that the district court did not err in refusing to give Clarkson's tendered jury instruction on impossibility of performance.

### (b) Mitigation of Damages

Clarkson argues that the district court erred in refusing to give its proffered jury instruction on mitigation of damages. It claims that Armstrong failed to mitigate her damages by failing to reapply for Clarkson's CRNA program or apply at a nurse anesthetist program at another school. Armstrong argues that it would have been futile to reapply at Clarkson after it withdrew her from the program and that she could not afford to attend a nurse anesthetist program at another school. We conclude that the district court did not err in refusing Clarkson's requested jury instruction on mitigation of damages.

There is no question that Clarkson's tendered instruction is a correct statement of law.[41] It is nearly identical to NJI2d Civ. 4.70, the model jury instruction on mitigation of damages.

But Clarkson's proffered jury instruction was not warranted by the evidence. A tendered jury instruction is warranted by the evidence only if there is enough evidence on the issue to produce a genuine issue of material fact for the jury to decide.[42]

---

[41] See *Borley Storage & Transfer Co. v. Whitted*, 271 Neb. 84, 95, 710 N.W.2d 71, 80 (2006) ("[t]he general rule is that whenever applicable, the Nebraska Jury Instructions are to be used [and the i]nstruction given by the district court is taken nearly verbatim from NJI2d Civ. 4.70 and is a correct statement of the law" (citations omitted)).

[42] See, generally, *Tapp v. Blackmore Ranch, supra* note 40; *Tedd Bish Farm v. Southwest Fencing Servs.*, 291 Neb. 527, 867 N.W.2d 265 (2015) (discussing jury instruction on mitigation of damages at summary judgment stage).

[30,31] Regarding the mitigation of damages, we have said:
Under the doctrine of avoidable consequences, which
is another name for the failure to mitigate damages, a
wronged party will be denied recovery for such losses
as could reasonably have been avoided, although such
party will be allowed to recover any loss, injury, or
expense incurred in reasonable efforts to minimize the
injury. . . . A plaintiff's failure to take reasonable steps to
mitigate damages bars recovery, not in toto, but only for
the damages which might have been avoided by reason-
able efforts.[43]

A party is required only to mitigate damages that might have
been avoided by "reasonable efforts."[44] A plaintiff is "'not
required to unreasonably exert himself or to incur an unreason-
able expense in order to'" mitigate damages.[45] In reviewing
the reasonableness of a party's actions to mitigate damages,
we often consider three factors: (1) the cost or difficulty to
the plaintiff of mitigation, (2) the plaintiff's financial ability to
mitigate, and (3) the defendant's actions to inhibit the plaintiff
from mitigating damages.[46]

The first two factors are dispositive here. The only evidence
presented at trial about Armstrong's ability to complete her
degree at another program was her testimony that, according
to Hoversten and one or two other program directors with
whom she spoke, nurse anesthesia credits are nontransferable,
meaning that she would have to start her 30-month program

---

[43] *Borley Storage & Transfer Co. v. Whitted, supra* note 41, 271 Neb. at 95,
710 N.W.2d at 80.

[44] See *id.*

[45] *Hidalgo Prop., Inc. v. Wachovia Mortg. Co.*, 617 F.2d 196, 200 (10th Cir.
1980). See, also, *System Components Corp. v. Florida DOT*, 14 So. 3d 967
(Fla. 2009); *Coughlin Const. v. Nu-Tec Indus., Inc.*, 755 N.W.2d 867 (N.D.
2008); *Chicago Title Ins. Co. v. HNB*, 87 Ohio St. 3d 270, 719 N.E.2d 955
(1999); *Great American Ins. v. N. Austin Utility*, 908 S.W.2d 415 (Tex.
1995).

[46] See *Tedd Bish Farm v. Southwest Fencing Servs., supra* note 42.

over from the beginning. According to Armstrong, Hoversten told Armstrong that she could reapply at Clarkson, but would have to start the program over. Clarkson has the only CRNA program in Omaha. There is only one other program in the state; according to Armstrong, Glidden—who decided not to allow her to return to UNMC—is on the board at that other program. And Armstrong also testified that she could not afford to reapply and start a CRNA program over.

Thus, according to the evidence presented at trial, in order to mitigate her lost future income damages, Armstrong would have had to start a 30-month program over; pay for that program, which she could not afford; and likely move out of state. A plaintiff is not required to make unreasonable efforts or incur unreasonable expense in mitigating damages. And ordinarily, a plaintiff is not required to make expenditures to mitigate that are beyond his or her financial means or to relocate to another city or state.[47] We conclude, as a matter of law, that Armstrong did not fail to mitigate her damages by not reapplying and enrolling at Clarkson or at another CRNA program. Clarkson's mitigation jury instruction was not warranted by the evidence, and thus, the district court did not err in refusing to give that instruction.

### (c) Failure to Fulfill Condition Precedent

Clarkson argues that the district court erred in refusing to give its proffered jury instruction on failure to fulfill a

---

[47] See, *Hegler v. Board of Ed. of Bearden Sch. Dist., Bearden, Ark.*, 447 F.2d 1078, 1081 (8th Cir. 1971) (holding that teacher's failure to apply for out-of-state teaching jobs was not failure to mitigate, because "it was not unreasonable for her to refuse to abandon her community and move to another state in order to reduce damages caused by the School Board's unlawful acts"); *Gerwin v. Southeastern Cal. Assn. of Seventh Day Adventists*, 14 Cal. App. 3d 209, 219, 92 Cal. Rptr. 111, 117 (1971) ("[o]rdinarily a duty to mitigate does not require an injured party to take measures which are unreasonable or impractical or which require expenditures disproportionate to the loss sought to be avoided or which are beyond his financial means").

condition precedent. It argues that exhausting its internal grievance procedure is a condition precedent to the enforceability of Armstrong's rights under the contract. We conclude that the district court erred in denying Clarkson's tendered jury instruction on Armstrong's alleged failure to fulfill a condition precedent by not exhausting Clarkson's grievance procedure.

While the district court should have instructed the jury on the condition precedent issue, Armstrong's failure to exhaust the grievance procedure would be irrelevant if she never agreed to the policy. To prevail on this defense, Clarkson must prove to a jury that the grievance policy was a term of the contract. As discussed above, the student handbooks that contain contractual disclaimers or reserve an unrestricted power to amend the policies contained therein are not contracts and do not supply the terms of the agreement between Clarkson and Armstrong. We are not deciding that the grievance policy was a term of the contract, but only that a jury should have been instructed on the issue. On remand, the jury will determine whether the grievance policy was a term of the contract and whether Armstrong's failure to grieve is excused by any of the exceptions to the exhaustion of remedies requirement.

### (i) Clarkson's Instruction Was
### Correct Statement of Law

[32,33] Armstrong argues that Clarkson's instruction was not a correct statement of law, because the doctrine of exhaustion of remedies does not apply to private, nongovernmental entities like Clarkson. This argument is without merit. Under the doctrine of exhaustion of administrative remedies, one must generally exhaust any available administrative remedies before one can seek judicial review.[48] The exhaustion requirement

---

[48] See *Vaccaro v. City of Omaha*, 6 Neb. App. 410, 573 N.W.2d 798 (1998), *affirmed* 254 Neb. 800, 579 N.W.2d 535.

has been considered a jurisdictional prerequisite in some cases and a condition precedent to filing suit in others.[49] This doctrine generally applies to governmental entities.[50]

[34] But the exhaustion of remedies doctrine also applies in many cases to private, nongovernmental entities that provide internal administrative review procedures. Courts have required plaintiffs to exhaust their remedies with private entities before seeking judicial review in cases involving mandatory grievance procedures in employee handbooks,[51] university grievance procedures for reviewing faculty tenure decisions,[52] union grievances against employers,[53] and intercollegiate athletic association appeals,[54] just to name a few. And this court has refused to grant equitable relief against a private association if the plaintiff-member has not first exhausted his or her remedies within the association.[55] We have also held that "an individual stockholder must exhaust all means of redress

---

[49] See *Vaccaro v. City of Omaha, supra* note 48, 254 Neb. 800, 579 N.W.2d 535 (1998).

[50] See, generally, *Vaccaro v. City of Omaha, supra* note 48, 6 Neb. App. 410, 573 N.W.2d 798 (1998).

[51] *McGuire v. Continental Airlines, Inc.*, 210 F.3d 1141 (10th Cir. 2000) (interpreting Colorado law).

[52] *Neiman v. Yale University*, 270 Conn. 244, 851 A.2d 1165 (2004).

[53] *Republic Steel v. Maddox*, 379 U.S. 650, 85 S. Ct. 614, 13 L. Ed. 2d 580 (1965).

[54] *State Board of Ed. v. National Collegiate Ath. Ass'n*, 273 So. 2d 912 (La. App. 1973). See, also, *Oliver v. Natl. Collegiate Athletic Assn.*, 155 Ohio Misc. 2d 1, 920 N.E.2d 190 (2008).

[55] *Crisler v. Crum*, 115 Neb. 375, 213 N.W. 366 (1927). See, also, *FHSAA v. Melbourne Central Catholic School*, 867 So. 2d 1281, 1287-88 (Fla. App. 2004) ("[g]enerally, the exhaustion doctrine applies not only to state agencies, but also to voluntary associations. . . . Under the common law, associations may require their members to exhaust all internal remedies within the association before resorting to any court or tribunal outside of the association. As a general rule, when a private organization has procedures for internal review of its decisions, those procedures must be exhausted before seeking redress from a court" (citations omitted)).

within the corporation before bringing" a stockholder deriva-tive suit.[56] In sum, the requirement of exhausting internal remedies with a private entity as a prerequisite to bringing suit is common throughout the law. Armstrong's argument that the exhaustion requirement does not apply to Clarkson's grievance procedure because it is not a governmental entity is unpersuasive.

Three cases on the exhaustion of remedies doctrine are instructive here. In *McGuire v. Continental Airlines, Inc.*,[57] the 10th Circuit Court of Appeals, interpreting Colorado law, addressed a breach of contract claim (among other claims) by an employee against his private employer, Continental Airlines (Continental). At trial, the jury found for the plain-tiff on the breach of contract claim. The plaintiff, whose employment had been terminated for violation of the company absence policy, alleged that his supervisor had miscalculated the number of his absences. In Continental's employee hand-book, it provided a four-step internal appeal process to con-test employee discipline. The appeal procedure stated, "'If a matter involving the proper application of Company policy or disciplinary action (including dismissal) is not resolved to the employee's satisfaction [after discussing the matter with the employee's immediate supervisor], the employee may file a formal appeal using Continental's Appeal Procedure.'"[58] The plaintiff did not initiate the final two stages of the appeal procedure.

The court began with the legal proposition that "[o]rdinarily, an employee must seek to exhaust an employer's exclusive internal grievance process before seeking judicial relief."[59] It then concluded that "Continental's grievance procedure

---

[56] *Kowalski v. Nebraska-Iowa Packing Co.*, 160 Neb. 609, 615, 71 N.W.2d 147, 151 (1955).

[57] *McGuire v. Continental Airlines, Inc., supra*, note 51.

[58] *Id*. at 1143-44.

[59] *Id.* at 1146.

was the exclusive remedy for challenging a breach of the Attendance Policy."[60] It reached this conclusion by reasoning that while the policy was expressed in permissive language ("'the employee *may* file a formal appeal'"[61]), under Colorado law, "[a]ny doubt as to the application of the [grievance] procedure is to be resolved in favor of exclusivity."[62] The court held that the plaintiff's breach of contract claim failed because he had failed to exhaust his remedies, and it reversed the jury's verdict.

Another instructive case from the Supreme Court of Connecticut is *Neiman v. Yale University*,[63] which Clarkson cites at length in its brief. In that case, a professor sued Yale University, a private school, for breach of contract arising from its failure to offer her a tenured faculty position. The university faculty handbook contained a grievance procedure, which stated that if a faculty member believed that a university policy had not been followed or insufficient consideration was given for a faculty reappointment or promotion decision, "'the faculty member *may* request review of his or her complaint.'"[64] The plaintiff did not file a grievance. The trial court dismissed the plaintiff's claim because of her failure to exhaust the grievance procedure.

The court held that the exhaustion requirement applied, stating, "We agree with the majority of jurisdictions that the exhaustion of remedies doctrine applies to the internal grievance processes provided by academic institutions."[65] It reasoned that "[t]o allow a plaintiff to sidestep these procedures would undermine the internal grievance procedure that the parties had agreed to and encourage other litigants to

---

[60] *Id.*

[61] *Id*. at 1143 (emphasis supplied).

[62] *Id.* at 1146.

[63] *Neiman v. Yale University, supra* note 52.

[64] *Id.* at 257, 851 A.2d at 1173 (emphasis in original).

[65] *Id.* at 255, 851 A.2d at 1172.

ignore the available process as well."[66] It also reasoned that with respect to tenure decisions, "academic institutions themselves are best suited to be the original forum for these types of disputes."[67]

The court also concluded that the grievance procedure, in spite of being phrased in permissive language ("'the faculty member *may* request review of his or her complaint'"), was mandatory.[68] The court said that the permissive language of the policy meant that "although the plaintiff was not compelled to pursue administrative remedies, the language meant that the plaintiff had the choice of either forgoing the grievance procedure and accepting the decision or using the procedure available."[69] The court affirmed the trial court's dismissal.

Another relevant case from the Court of Appeals of New Mexico is *Lucero v. UNM Bd. of Regents*.[70] The plaintiff, who worked at the University of New Mexico Health Sciences Center, sued his former employer. He brought a breach of contract claim (not a due process claim) based on the termination of his employment, which he argued violated the employee handbook. The handbook's grievance procedure stated that if an employee could not resolve an issue with his or her immediate supervisor, the employee "'may submit a grievance in writing to the immediate supervisor or Administrator.'"[71] The plaintiff did not file a grievance. The trial court held a bench trial and entered judgment in favor of the plaintiff.

The court reversed the trial court's judgment because the plaintiff had failed to file a grievance. It stated that "an employee must exhaust grievance procedures in an employee

---

[66] *Id.*

[67] *Id.*

[68] *Id.* at 257, 851 A.2d at 1173 (emphasis in original).

[69] *Id.* at 257-58, 851 A.2d at 1173.

[70] *Lucero v. UNM Bd. of Regents*, 2012 NMCA 055, 278 P.3d 1043 (2012).

[71] *Id.* at ¶ 2, 278 P.3d at 1044.

handbook or manual before filing claims against the employer for breach of contract."[72] The court noted that "[c]ourts from other jurisdictions have uniformly applied the same rule, regardless of whether the employer is a public entity or a private entity."[73]

[35] What these cases illustrate is that where an employer or university provides a mandatory grievance procedure in a contract, the enforceability of a party's rights under the contract is conditioned on the exercise of that grievance procedure. Several rationales underlie the requirement of exhaustion of remedies in these and other similar cases. These rationales are not limited to the employment context, but apply with equal force to the internal procedures of colleges and universities.

First, the exhaustion requirement is important because it allows the private entity—whether an employer, labor union, private association, or university—"to redress wrongs without burdening the courts with unnecessary litigation."[74] Courts need not and should not be in the business of addressing internal issues within a private organization before the decisionmaking process has had the opportunity to run its course and become final. Here, Clarkson's grievance committee, composed of outside individuals in the college without any conflicts of interest, may well have decided that Armstrong should not have been disciplined, that she should have been given more time to complete the program, and that she should not have been administratively withdrawn, or could have made some other decision favorable to her. By allowing Clarkson's decisionmaking process to run its full course, the need for judicial intervention may well have been obviated. Not only does the exhaustion requirement give the school the opportunity to correct its own potential mistakes through its grievance procedure, but it conserves valuable and scarce

---

[72] *Id.* at ¶ 10, 278 P.3d at 1045.

[73] *Id.* at ¶ 12, 278 P.3d at 1046.

[74] *Id.* at ¶ 13, 278 P.3d at 1046.

judicial resources by preventing unnecessary litigation in some cases.

Related to the policy of conservation of judicial resources, the exhaustion requirement serves to build a record if later judicial proceedings do ensue and to clarify the parties' arguments and sharpen the focus on the relevant evidence.[75] By attempting to resolve the issues internally, the scope of the dispute may be narrowed, making resolution easier for later judicial proceedings.

[36] Finally, failing to treat mandatory grievance procedures as a condition precedent would effectively make them optional. It would undermine an organization's ability to create by contract a single forum to resolve all of its internal disputes. And as one court reasoned, mandatory grievance procedures must be exhausted before seeking judicial review, because the grievance procedure "is part of the contractual bargain and defines the rights themselves."[76]

[37] The exhaustion of a mandatory grievance procedure in a contract is a condition precedent to enforcing the rights under that contract.[77] Because Armstrong's argument that the exhaustion requirement does not apply to private entities is without merit, we disagree that Clarkson's instruction was an incorrect statement of law.

Armstrong also argues that Clarkson's instruction is not a correct statement of law because the grievance policy does not expressly state that it is a condition precedent to the enforceability of Clarkson's duties under the contract. But the exhaustion of a mandatory grievance procedure in a contract is a condition precedent to enforcing the rights under that contract.[78]

---

[75] *Soentgen v. Quain & Ramstad Clinic, P.C.*, 467 N.W.2d 73 (N.D. 1991).

[76] *Berkowitz v. President & Fellows of Harvard*, 58 Mass. App. 262, 275, 789 N.E.2d 575, 585 (2003).

[77] See, *McGuire v. Continental Airlines, Inc., supra* note 51; *Lucero v. UNM Bd. of Regents, supra* note 70; *Neiman v. Yale University, supra* note 52.

[78] *Id.*

The grievance procedure does not need to expressly state that it is a condition precedent.[79] The fact that the instruction refers to an implied duty to exhaust the grievance procedure does not mean that it is an incorrect statement of law.

### (ii) Clarkson's Instruction Was
### Warranted by Evidence

Clarkson's instruction was not only a correct statement of law, but it was warranted by the facts. Clarkson presented evidence that it provided a copy of the grievance policy and the grievance form to Armstrong when she was placed on probation. And the grievance procedure was mentioned in some of the student handbooks distributed to Armstrong. Clarkson presented evidence that Armstrong was aware of the policy. There was sufficient evidence to create a factual issue for the jury regarding whether the grievance policy was a term of the contract between Clarkson and Armstrong.

And Clarkson's grievance policy was clearly intended to be mandatory. The policy explains how a student may file a grievance and states that "[t]he Grievance Committee is the designated arbiter of disputes within the student community in cases, which do not involve a violation of the Student Code of Conduct . . ." and that the committee's decisions are final. This language is not unlike the language of the grievance policies found to be mandatory in the cases discussed above.[80] We do not presume that Clarkson intended its grievance procedure to be optional.

But in deciding that Clarkson's jury instruction was warranted by the evidence, we make no comment on whether any

---

[79] *Id.* See, also, *Sylvain v. Spaulding Rehabilitation Hosp. Corp.*, No. 15-5475-D, 2016 WL 1125940 at *10 (Mass. Super. Mar. 23, 2016) (unpublished decision) ("the law does not require that internal grievance procedure exhaustion be compelled in express terms as a condition for making later contract claims in court").

[80] See, *McGuire v. Continental Airlines, Inc., supra* note 51; *Lucero v. UNM Bd. of Regents, supra* note 70; *Neiman v. Yale University, supra* note 52.

of the exceptions to the exhaustion requirement, such as futility or inadequacy of the remedy, apply in this case.[81] While Armstrong could have filed a grievance to appeal the decision to place her on probation, it is not clear whether she could have filed a grievance to appeal the decision to withdraw her from the program after she was administratively withdrawn and was no longer a student. At trial, Armstrong testified that she believed she was not able to file a grievance after she had been withdrawn from the program. On its face, the grievance policy does not state whether a former student may file a grievance to dispute a dismissal or administrative withdrawal after the dismissal or withdrawal when the former student is no longer enrolled at the college. This argument about whether the grievance policy was available to Armstrong—and thus whether it was an adequate remedy that she was required to exhaust—is best addressed by a jury that has been instructed on the issue.

We also do not address whether Clarkson is estopped from arguing that Armstrong failed to fulfill a condition precedent based on her failure to file a grievance because of the statement made to her by Damewood, the vice president of operations, regarding her behavior's constituting a Code of Conduct violation—to which the grievance policy does not apply. Nor do we address whether Armstrong's failure to use the grievance policy is excused by the doctrine of prevention.[82] These are factual questions for the jury to decide on remand.

While Armstrong may argue to the jury that Damewood's statement excused her from exhausting Clarkson's grievance procedure, this does not mean that Clarkson's instruction was not warranted by the evidence. Armstrong argues that the

---

[81] See, e.g., *Vaccaro v. City of Omaha, supra* note 48, 6 Neb. App. 410, 573 N.W.2d 798 (1998) (there are exceptions to exhaustion doctrine's application); 2 Am. Jur. 2d *Administrative Law* § 454 (2014).

[82] See, *D & S Realty v. Markel Ins. Co., supra* note 38; *Fast Ball Sports v. Metropolitan Entertainment, supra* note 16.

grievance policy is inapplicable, because it expressly does not apply to Code of Conduct violations. But Armstrong was not disciplined for violating the Code of Conduct. Armstrong was disciplined for violating the CRNA program handbook and the AANA Code of Ethics.

Armstrong's argument that the grievance policy did not apply to her is based on one issue: At the initial meeting on April 23, 2013, Damewood told Armstrong that her conduct violated the Code of Conduct.

To bring charges for a Code of Conduct violation, a member of the college community must prepare written charges and present them to the judicial advisor, Damewood. The written charges must then be presented to the accused student in writing. No written charges of violating the Code of Conduct were ever filed by anyone with Damewood, nor were any written charges ever presented to Armstrong. Outside of Damewood's statement at the first meeting, there is no evidence that the Code of Conduct was discussed. In the second meeting, at which Armstrong was given the formal notification that she was being placed on probation, Armstrong was told that she was being placed on probation for violating the CRNA program handbook's professionalism rule and the AANA Code of Ethics. At trial, when discussing the outline of the April 24 meeting at which she was placed on probation, Armstrong admitted that the basis for her probation was violation of the CRNA program handbook and the AANA Code of Ethics, not the Code of Conduct.

Armstrong's argument that the grievance procedure was inapplicable because it does not apply to Code of Conduct violations is without merit, because she was never charged with a violation of the Code of Conduct. Damewood's incorrect statement that Armstrong had violated the Code of Conduct may be relevant to an estoppel argument—made to a jury properly instructed on the exhaustion issue—but it does not mean that the instruction was not warranted by the evidence.

### (iii) Clarkson Was Prejudiced by Court's
### Failure to Give Requested Instruction

Finally, we conclude that the district court's refusal to give Clarkson's proffered jury instruction on Armstrong's failure to fulfill a condition precedent by not filing a grievance was prejudicial to Clarkson. Armstrong argues that there was no prejudice to Clarkson, because the substance of the proposed instruction was covered by the court's instruction to the jury that Armstrong bore the burden of proving that she "substantially performed her part of the contract." But whether a condition precedent was met is not the same question as whether a party substantially performed a contract. As a condition precedent, using the grievance procedure would be necessary to trigger the enforceability of Clarkson's duties under the contract, but if using the grievance were merely one of Armstrong's many duties under the contract, then the jury may determine that she substantially performed her duties under the contract in spite of not filing a grievance. Armstrong's argument that the condition precedent instruction was covered in substance by the substantial performance instruction is legally incorrect. No other jury instruction adequately covered the issue of Armstrong's failure to fulfill a condition precedent by not filing a grievance.

Because Clarkson's tendered jury instruction was a correct statement of law and was warranted by the evidence, and because the failure to give this instruction was prejudicial to Clarkson, the district court erred in refusing to give Clarkson's instruction. We reverse the judgment of the district court and remand the cause for a new trial in accordance with this opinion.

### 4. DENIAL OF CLARKSON'S MOTION TO SET
### ASIDE VERDICT OR FOR NEW TRIAL

Clarkson's motion to set aside verdict or motion for new trial is derivative of its other alleged errors. Having concluded that the district court committed reversible error in

failing to instruct the jury on the issue of Armstrong's alleged failure to fulfill a condition precedent by not exhausting Clarkson's grievance procedure, we conclude that the district court abused its discretion by denying Clarkson's motion for new trial.

## VI. CONCLUSION

For the reasons set forth in this opinion, we reverse the judgment of the district court and remand the cause for a new trial in accordance with this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.