IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ALBERTS V. ALBERTS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOAN L. ALBERTS, APPELLANT,

V.

THOMAS A. ALBERTS, APPELLEE.

Filed February 19, 2019.    No. A-18-075.

Appeal from the District Court for Clay County: VICKY L. JOHNSON, Judge. Affirmed as modified.

Heather Swanson Murray, of Swanson Murray Law, L.L.C., and Melodie T. Bellamy, of Bellamy Law Office, for appellant.

Adam R. Little, of Ballew Hazen, P.C., L.L.O., and Joshua Aaron Johnson, of Conway, Pauley & Johnson, P.C., for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

MOORE, Chief Judge.

I. INTRODUCTION

Joan L. Alberts appeals from the order of the district court for Clay County, which dissolved Joan's marriage to Thomas A. Alberts. On appeal, Joan assigns error to the court's award of custody and attorney fees and the determination and division of the marital estate. For the reasons set forth herein, we affirm as modified.

II. BACKGROUND

The parties were married on August 8, 1997. At the time of their marriage, Joan had three minor children from two prior marriages. These children are no longer minors, and we do not discuss them further, except to note that Thomas cared for them as if they were his own. The parties

- 1 -

have two children together--Alika L. Alberts, born in September 1999, and Isaac T. Alberts, born in May 2001.

Thomas is a farmer. He owned one quarter section of land and certain farming equipment prior to the marriage. The parties purchased three additional quarter sections of land and additional farming equipment during the marriage. Joan works in an administrative position at a hospital and earned several degrees during the marriage, which allowed her to advance her career.

Alika has significant developmental issues, including autism. Many of the pretrial disputes between the parties and a great deal of the trial evidence related to Alika's custody, the choice of suitable care givers for Alika, and the parties' approach to her medical care, including the administration of certain medications prescribed for her. However, Alika has reached the age of majority since entry of the decree of dissolution in this case and any issues with respect to her custody have become moot. We limit our discussion of the pretrial activity and trial evidence to that which bears on our analysis of custody with respect to Isaac.

The parties separated in 2011, at which time Thomas moved out of the marital residence and began living on the farm with his mother a few miles outside of Saronville, Nebraska. Joan and the children continued to live in the marital residence in Saronville. However, until the time of an ex parte custody order entered in August 2013, Thomas would come to the marital residence and provide care for the children between the time when Joan left for work and when the children left for school, as well as after school. Child care was also provided at times by Thomas' adult nephew, Phillip Alberts.

On August 14, 2013, Joan filed a complaint for dissolution of marriage in the district court. She sought a determination and division of the marital estate; ex parte, temporary, and permanent custody of the children; temporary and permanent child support; and attorney fees. Joan included an affidavit in support of her request for ex parte custody, in which she stated that she feared Thomas would become "volatile" and try to take the children upon learning that she filed the action. Joan stated that Thomas had a history of anger control issues and his "volatile personality throughout this transition" was cause for concern with regard to how his actions might negatively affect the children. On August 15, the court granted Joan ex parte custody of the children until a temporary hearing could be held, subject to reasonable parenting time by Thomas.

Thomas answered and filed a cross complaint, requesting an equitable division of the marital estate, temporary and permanent child support and custody, and attorney fees.

On September 24, 2013, the district court entered an order granting the parties temporary joint legal custody of the children. Although the court considered awarding temporary joint physical custody, it awarded temporary physical custody to Joan based on Alika's special needs and the fact that during the parties' 2-year separation the children had resided with Joan with Thomas visiting them "apparently only in Joan's home." The court noted that the parties had previously shared parenting responsibilities by having Thomas arrive early in the morning after Joan left for work and having him care for the children after school and urged them to re-implement this plan. The court ordered Thomas to pay child support of $808 for two children and $568 for one child and specified a temporary parenting plan. The parenting plan for Alika involved a transition period over 6 weeks of increasing parenting time with Thomas. The temporary parenting plan for Isaac (and Alika after the transition period) included parenting time with Thomas every

other weekend from 7 p.m. Friday to 5 p.m. Sunday, Wednesday each week from after school until 8 p.m., and holiday parenting time as specified in the order.

During the course of the proceedings, the district court appointed Adam Pavelka of Agri Affiliates to manage the four quarter sections of real property at issue due to the parties' inability to agree on certain matters.

The parties' farm near Saronville was struck by a tornado on May 11, 2014, which caused significant damage to the residence where Thomas lived with his mother, as well as outbuildings and equipment, and required extensive repair work. The planting season had started but was not yet finished. Insurance funds were received for the tornado damage, and a stipulation of the parties was approved by the district court. The court ordered that Thomas was allowed to take possession of and control the insurance proceeds to fix the farm and farmstead at his discretion; that the farm manager was released from any responsibility to manage the funds; and that Thomas was to share with Joan all information given to and received from the parties' insurance company for all claims with respect to the tornado damages.

In December 2014, the parties entered into a bidding agreement, which set forth a process whereby they divided their real and personal property, except for items which the parties had identified in their joint property statement as being disputed. As a result of this process, Thomas took control of the quarter section of real property that he owned prior to the marriage and Joan took control of the remaining three quarter sections. We set forth further details of the bidding agreement in our analysis below.

Trial was held before the district court on December 22-23, 2015; and on January 19 and 21, February 12, March 4, 16, and 23, April 13; and June 1, 2016. The record is voluminous and includes testimony from the parties, their accountant, friends and neighbors, individuals who conducted real estate appraisals, and others. The court also conducted an in camera interview of Isaac and received numerous exhibits. A significant portion of the evidence focused on issues surrounding Alika's care, which we need not detail. Other issues covered by the evidence included the 2014 tornado damage, the insurance proceeds received for the tornado damage, and the division of the marital estate, especially those disputed items not divided by the parties pursuant to the bidding agreement and certain premarital property that one or the other of the parties asserted had been converted, at least in part, to marital property. We have thoroughly reviewed the record, but given its size, we do not further recount the evidence here. We have summarized those portions of the evidence relevant to the issues raised on appeal in the respective sections of the analysis below.

On August 2, 2016, Thomas filed a motion for leave to withdraw his rest in order to submit the 2015 income tax information of the parties as well as attorney fee affidavits. Thomas asserted that 2015 was the first year that the district court "could have a clean picture of what the parties' respective income[s] could be if the land is divided in accordance with the Bidding Agreement, as each of the parties operated their respective farm operations as separate entities in 2015 without comingling of marital assets" and that the court would need this "clean 2015 income information" to calculate child support. Thomas further alleged that the amount of attorney fees could not be completely ascertained during the course of trial as the record had been held open for a posttrial deposition of an out-of-state witness. Thomas noted the detailed and lengthy written closing arguments that had been submitted by the parties' attorneys. Thomas also filed a motion, asking

the court to allow telephonic testimony from the parties' certified public accountant, who lived in Florida, concerning Thomas' 2015 tax return, depreciation taken, and related matters. The court granted Thomas' motions, as well as a request by Joan to submit an attorney fee affidavit. This additional evidence was received at a hearing on September 15, 2016.

On October 3, 2016, the district court entered a temporary order determining custody, indicating that a final decree might not be prepared "for some time" given the complexity of the issues. The court made extensive, detailed factual findings, which it incorporated into the decree of dissolution, which was not entered until September 23, 2017. We discuss those findings in greater detail in the analysis section below. As to the court's actual custody determinations, the court awarded Thomas legal custody of the parties' children and ordered that physical custody be shared on a rotating weekly basis. The court ordered Thomas to pay child support for two children of $128 per month, retroactive to October 1, 2016, and for one child of $128 per month. The court entered a judgment against Thomas for $1,408 for the retroactive support. The court found that it had erred in receiving certain insurance company documents (exhibits 168, 169, 179, and 210), reversed its previous ruling receiving those exhibits, and indicated that those exhibits had been disregarded. The court divided the marital estate and entered a judgment against Joan of $2,341,663.76 for property equalization. We have set forth further details of the property division in the analysis section below. Finally, the court ordered Joan to pay $20,000 of Thomas' attorney fees.

Joan filed a motion for new trial and a motion to alter or amend the decree. Thomas also filed a motion to alter or amend. Following a hearing on the parties' motions, the district court entered an order, making certain amendments to the prior property division and ordering Joan to pay a property equalization of $2,341,308.11 for property equalization within 90 days. The court also amended the decree to provide that all reasonable and necessary direct expenditures made solely for the children such as clothing and extracurricular activities were to be allocated equally between the parties. The court overruled the balance of the motions to alter or amend and also overruled the motion for new trial.

## III. ASSIGNMENTS OF ERROR

Joan asserts, consolidated and restated, that the district court erred in (1) awarding legal custody of the parties' children to Thomas, (2) awarding joint physical custody without specifically finding that it was in the children's best interests, (3) determining and valuing what was premarital and postfiling property, (4) valuing and dividing the marital estate, (5) reversing its ruling regarding certain exhibits, (6) allowing Thomas to withdraw his rest and offer further evidence more than 2 months after the case was taken under advisement, and (7) ordering Joan to pay $20,000 to Thomas for attorney fees.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial

abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Lindsay Internat. Sales & Serv. v. Wegener*, 301 Neb. 1, 917 N.W.2d 133 (2018). When the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017).

The reopening of a case to receive additional evidence is a matter within the discretion of the district court and will not be disturbed on appeal in the absence of an abuse of that discretion. *Thompson v. Thompson*, 18 Neb. App. 363, 782 N.W.2d 607 (2010). The matter of permitting a party to withdraw his or her rest is within the trial court's discretion, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. *Davis v. Davis*, 7 Neb. App. 78, 578 N.W.2d 907 (1998).

## V. ANALYSIS

### 1. CUSTODY

Joan assigns error both to the award of sole legal custody to Thomas and to the award of joint physical custody on a rotating weekly basis without a finding that joint physical custody was in the children's best interests. Since Alika has reached the age of majority, the issue of her custody is moot, and we only consider whether the court abused its custody determinations with respect to Isaac.

When custody of a minor child is an issue in a proceeding to dissolve the marriage of the child's parents, child custody is determined by parental fitness and the child's best interests. *Maska v. Maska*, 274 Neb. 629, 742 N.W.2d 492 (2007). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id.* Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member. . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

In addition to the "best interests" factors listed in § 43-2923, a court making a child custody determination may consider matters such as the moral fitness of the child's parents, including the parents' sexual conduct; respective environments offered by each parent; the emotional relationship between child and parents; the age, sex, and health of the child and parents; the effect on the child as the result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

(a) District Court's Custody Findings

The district court summarized evidence relating to the parties' parenting of their own children, as well as Thomas' parenting of Joan's other children. The court found that while Joan advanced her career by acquiring further education in the early part of the marriage, Thomas actively parented all five children, preparing many meals, getting the children ready for school, being present when they returned from school, and completing a lot of the housework. The court stated, "Obviously, [Thomas'] ability to do so while engaged in planting and harvest was limited," leading Thomas' mother and nephew to provide assistance, but the court observed that Thomas' farming practices "allowed him a great deal of freedom to accomplish these tasks while still farming successfully." The court noted that until the parties' separation, Joan stayed at work past 5 p.m., worked evenings from home and/or took classes or otherwise studied on many evenings.

The district court addressed the parties' parenting time disagreements, observing that despite the court's direction in the temporary order to follow the parties' previous arrangement whereby Thomas provided direct care to the children every day, Joan "did not jointly parent the minor children," made "unilateral decisions regarding their care," and "rebuffed [Thomas'] efforts to care for the children other than during his specifically awarded parenting time." Additionally, the court observed that after the children were placed with Joan, she developed a work schedule that allowed her to ensure the children received care while she was working, noting however that she did not include Thomas as a caregiver when "it was clear that he was willing and able to provide care for his children if Joan could not." The court noted Joan's refusal to adjust Thomas' summer parenting time in 2014 to allow him to deal with the tornado damage before the children came to stay with him for half the summer. The court also noted that Thomas, upon advice of counsel, only communicated with Joan by text or email, a fact which the court determined "helped contribute to the inability of the parties to communicate easily."

The court summarized the considerable amount of testimony from medical, psychological, and psychiatric experts relative to Alika and made numerous findings which we need not discuss. We discuss only the district court's findings relevant to Isaac's custody, which findings are consistent with our own de novo review of the record.

The district court observed that the only notable medical issue with respect to Thomas was his anxiety, which was being handled with medication. The court also noted testimony from Tony Gauthier who has been Thomas' counselor for several years. Gauthier has aided Thomas in his transition through the divorce. He opined that Thomas does not have an anger disorder, and that there were legitimate reasons for Thomas' anger with Joan. The court concluded that Thomas' anxiety issues were under control and that he does not have a problem with alcohol. The court

stated, "Given the issues that led to the end of this marriage, the Court does not feel that his anger was misplaced or cause for alarm when it comes to parenting the children." Likewise, the court was not concerned by Thomas' two driving while intoxicated charges, which occurred over 30 years ago.

The district court referenced its interview of Isaac, stating that it has considered Isaac's "desires and the reasoning therefore" in reaching its decision.

In conclusion, the district court stated:

There is no purpose to be served by reiterating the numerous instances of discord between [Thomas] and Joan. It is obvious that their dislike of each other has affected their relationships with their children. It is the court's strong conclusion that Joan has actively worked to alienate [Thomas] from his children. It believes just as strongly that [Thomas] puts the interests of his children before anything else. While [Thomas] is not a perfect parent, the Court reposes significantly more trust in his parenting abilities. Given the strong history of discord between these two, the fact that Joan has chosen to disregard the Court's previous directions aimed at establishing a coparenting relationship between [the parties], and the parental alienation instigated by Joan which is obvious from the record, the Court chooses to award legal custody of the minor children to [Thomas]. Physical custody will be shared on a rotating weekly basis.

(b) Legal Custody

"Joint legal custody means mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Courts typically do not award joint legal custody when the parties are unable to communicate effectively. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). Where the parties are unable to communicate and trust one another, joint decisionmaking by the parents is not in the child's best interests. *Id.*

Nebraska statutes do not require the district court to grant equal parenting time or joint custody to the parents if such is not in their children's best interests. See *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009). Neb. Rev. Stat. § 42-364(3) (Reissue 2016) provides:

Custody of a minor child may be placed with both parents on a joint legal custody or joint physical custody basis, or both, (a) when both parents agree to such an arrangement in the parenting plan and the court determines that such an arrangement is in the best interests of the child or (b) if the court specifically finds, after a hearing in open court, that joint physical custody or joint legal custody, or both, is in the best interests of the minor child regardless of any parental agreement or consent.

The parties shared joint legal custody pursuant to the pretrial temporary order, and they addressed the issue of joint desicionmaking at trial. The district court determined, however, that Thomas should be awarded sole legal custody of the parties' children. As illustrated by the court's summation above and our own de novo review of the evidence, the parties had communication difficulties, different parenting styles, and difficulty coparenting under the temporary order. Given

the parties' difficulty in communicating and trusting one another, joint decisionmaking by the parties was not in the children's best interests. See *id.* Accordingly, we agree that an award of sole legal custody to one party was appropriate. Joan questioned some of the decisions Thomas made concerning Alika's health and welfare, but as did the district court, we note that after a thorough investigation, Joan's concerns were not substantiated. Our review of the record supports the court's conclusions that Thomas' decisions with respect to Alika were appropriate, and we see nothing about those decisions that renders him an inappropriate decisionmaker with respect to Isaac. We find no abuse of discretion in the court's decision to award sole legal custody of Isaac to Thomas.

(c) Physical Custody

"Joint physical custody means mutual authority and responsibility of the parents regarding the child's place of residence and the exertion of continuous blocks of parenting time by both parents over the child for significant periods of time." § 43-2922(12). Joint physical custody should be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Erin W. v. Charissa W.*, 297 Neb. 143, 897 N.W.2d 858 (2017). A district court abuses its discretion to order joint custody when it fails to specifically find that joint physical custody is in the child's best interests as required by § 42-364. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007); *Hill v. Hill*, 20 Neb. App. 528, 827 N.W.2d 304 (2013).

Joan argues, and Thomas acknowledges, that the district court did not specifically find that joint physical custody was in the children's best interests. The court abused its discretion in failing to make such a finding. See *Zahl v. Zahl, supra*; *Hill v. Hill, supra*. And, while it might be argued given the court's detailed findings with respect to custody that it implicitly found joint physical custody to be in the children's best interests, implicit findings cannot satisfy procedural rules requiring explicit findings. *Zahl v. Zahl, supra*. We determine, however, that this failure does not require us to reverse the court's physical custody award.

In *Zahl v. Zahl*, the Nebraska Supreme Court reversed an award of joint physical custody after finding that the husband was denied due process in connection with the trial court's award. The Supreme Court found that when a trial court determines at a general custody hearing that joint physical custody is, or may be, in a child's best interests, but neither party has requested this custody arrangement, the court must give the parties an opportunity to present evidence on the issue before imposing joint custody. *Id.* The Court also found that the trial court abused its discretion to order joint custody by failing to specifically find that joint physical custody was in the child's best interests. This court reversed an award of joint physical custody in *Hill v. Hill, supra*, for similar reasons.

The case before us does not present similar due process concerns. Prior to trial, Thomas requested a 50/50 parenting time schedule, and Alika was evaluated to see if such a schedule was appropriate. Accordingly, the parties presented evidence on this issue at trial. Although the district court in this case abused its discretion in failing to specifically find that joint physical custody was in the children's best interests, it made detailed findings and analysis which relate to the children's

best interests. Appeals in domestic relations matters are heard de novo on the record, and thus, an appellate court is empowered to enter the order which should have been made as reflected by the record. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Because the parties were given the opportunity to present evidence on the issue of joint physical custody, in our de novo review we have considered whether the evidence reflects that such an arrangement was in Isaac's best interests, and we have entered the order which should have been made.

While a joint physical custody arrangement might seem at odds with the district court's award of sole legal custody to Thomas and the court's emphasis on the "strong history of discord" between the parties, the evidence shows that a physical custody arrangement involving fewer parenting time transitions and a regular, predictable schedule was best for Alika. And, while Isaac, 14 years old at the time of trial, expressed a preference for living with Joan, his preference is just one of the statutory factors to be considered in determining best interests. In reaching its decision, the court had to balance Isaac's preference against the particular needs presented by Alika's various diagnoses that were relevant at that time.

Isaac's expressed reason for his preference was that he had always lived in the house where Joan resided, so he felt more comfortable there. The record shows that Isaac was increasingly resistant to spending weekend parenting time with Thomas beginning in the fall of 2015, and both Isaac and Thomas testified about an argument they had in early 2016 which stemmed from Isaac's desire to stay at a friend's house on a weekend that Thomas had parenting time. Isaac referenced the difficulty his parents had in making decisions regarding Thomas' parenting time "because of the divorce." Nevertheless, Isaac acknowledged that both parents love him and are available to talk with him. He testified that both parents helped him with his homework and encouraged him to work hard in school. Other evidence in the record shows that Isaac is a good student and he participates in various sports and other extracurricular activities that both parents attend.

It is clear that both parties love and have a bond with the children and have provided considerable care for both of the children during their lives. Under the particular circumstances of this case, equal blocks of extended parenting time will provide stability and consistency for Isaac and will reduce the potential for conflict between the parties. Accordingly, we find that an award of joint physical custody is in Isaac's best interests.

2. PROPERTY DIVISION

Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Westwood v. Darnell, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* Joan presents arguments relating to all three steps in this process and to the district court's failure to receive or consider certain evidence relevant to this process.

(a) Classification of Property as Marital or Nonmarital

As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Westwood v. Darnell, supra*. Exceptions to the rule that all property accumulated and acquired during the marriage is marital property includes property accumulated and acquired through gift or inheritance. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.* Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* In an action for dissolution of marriage, a court may divide property between the parties in accordance with the equities of the situation, irrespective of how legal title is held. *Claborn v. Claborn*, 267 Neb. 201, 673 N.W.2d 533 (2004). Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Stephens v. Stephens*, 297 Neb. 188, 899 N.W.2d 582 (2017).

*(i) Premarital Quarter Section*

Thomas had one premarital quarter section of land. The premarital quarter was mortgaged at the time of the parties' marriage; that debt was paid during the marriage, and the parties continued to use both the premarital quarter section and the quarter sections purchased during the marriage as collateral for additional loans with none of the real property being "debt-free" during the marriage. The premarital quarter section was dryland farm ground when the parties were married, but it was converted for irrigation during the marriage, which significantly increased its value. The district court found that the premarital quarter section was Thomas' premarital property, but the court included $246,404 of its present value of $1,557,906 in the marital estate. Joan argues that the entire value of the premarital quarter section, or at least a greater portion of the value, should have been included in the marital estate given the payments made on the debt and real estate taxes, and the improvements made to the property during the marriage.

The parties had the premarital quarter section appraised. Randall Gustafson's February 13, 2015, "as is" (i.e., improved by irrigation) appraisal of the premarital quarter section showed that it had a market value of $1,557,906. He also performed a second appraisal, also effective as of February 13, 2015, to determine what the premarital quarter section would be worth if it were still dryland with irrigation potential, using a sales comparison approach. This second appraisal yielded a market value of $1,311,502. The premarital quarter section was also appraised by David Malone, whose appraisal provided a value as of August 7, 1997, of $190,000 and as of August 14, 2013, of $1,582,000. Malone testified that the agricultural land market had "gone up several times" during the period spanned by his two appraisals. He testified that the increase shown by his two appraisals was attributable to market conditions and to the fact that the property had been improved for irrigation, but his appraisals did not provide information to account for what portion of the 2013 value was attributable to the irrigation improvement.

Clearly, the district court used Gustafson's appraisals in valuing the premarital quarter section. The marital portion of the value is the difference between Gustafson's two appraisals ($1,557,906 − 1,311,502 = $246,404). Joan argues that the court should not have used Gustafson's appraisals given their dates well after the parties' separation and the filing of the complaint in this case. As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). The date of valuation is reviewed for an abuse of the trial court's discretion. *Id.* While Gustafson's appraisals are from a later date than Malone's appraisal, Gustafson's appraisals provided the only evidence in the record allowing the court to determine what portion of the increased value of the premarital quarter section was attributable to the irrigation improvement, an increase appropriately considered a marital asset by the court.

A nonowning spouse is entitled to some benefit when marital funds have been expended to improve or reduce the debt on the other spouse's nonmarital property. *Id.* Joan was given some benefit for the improvement made to Thomas' premarital property by inclusion of a portion of the increased value in the marital estate. And, while debt secured by Thomas' premarital property was paid during the marriage, additional debt was incurred on the property throughout the marriage.

We find no abuse of discretion in either the court's use of Gustafson's appraisal figures or in the court's decision to consider only $246,404 of the premarital quarter section's value a marital asset.

### (ii) Premarital Machinery and Equipment

The district court set aside as Thomas' premarital property, certain farm machinery and equipment (items C12-C13, C16-C17, D15-D19, D27-D29, D32 (three out of four fuel barrels, one was considered marital), D34-D40, D47, and D50). Thomas identified these items as his premarital property in the amended joint property statement; Joan placed values on all of these items. No appraisals or other testimony was offered to support the values listed by Joan on the property statement. At trial, Thomas asked the court to award him all of these items at no cash value as they were all owned by him prior to the marriage. Joan argues that the value of Thomas' premarital machinery and equipment that had premarital debt against it that was paid during the marriage with marital funds has also lost its premarital status and that at least some of the value of these items should have been included in the marital estate. Thomas admitted that he had some premarital debt on these items that he brought into the marriage. As with the premarital quarter section, these items were used as collateral for additional loans and were never "debt-free" during the marriage.

We find no abuse of discretion in the court's decision to set aside the premarital personal property still possessed by Thomas.

### (iii) 2014 CRP Payments

The parties received certain payments due to the enrollment of their real property in the Conservation Reserve Program (CRP) and their participation in the Conservation Security Program (CSP). In the decree, the district court characterized the following items awarded to Thomas as "post-filing" and accordingly did not include a value for them in the marital estate:

"2014 Corp CRP Payments," "2014 Corp CSP Payments," "2014 Corp CSP penalty," and "2014 Personal CRP/CSP payments," consistent with how Thomas had characterized these items in the amended joint property statement. We refer to these items collectively as "the 2014 CRP payments." In the property statement, Joan valued the individual 2014 CRP payments at $27,787, $43,389, −$21,273, and $4,349, respectively. On appeal, Joan argues that the court erred in determining that the 2014 CRP payments were postfiling assets and in not including them in the marital estate at her values, suggesting that the total value of these payments, $54,252, should have been included as an asset awarded to Thomas, as he was the party who actually received them. Thomas argues that the court properly excluded the 2014 CRP payments from the marital estate as they were postfiling income and that they were properly retained by him as the farm was still operated entirely by Thomas during 2014.

The complaint in this case was filed in August 2013. Pavelka's appointment as farm manager ended at the conclusion of the 2014 growing season due to the bidding agreement and the parties' division of their jointly owned real property. Pavelka thereafter continued to manage Joan's three quarter sections on her behalf. In Pavelka's initial management inspection report for a farm visit in May 2014, he stated that Thomas had "agreed and continues to comply with the CRP contract, and will continue to receive the tenant's share of these payments." Pavelka was asked about his efforts on Joan's behalf after the bidding agreement with respect to the farm programs, and indicated that Thomas did not execute all of the necessary documents, which resulted in Thomas receiving the 2015 CRP payments for two of the quarter sections under Joan's control, payments which Pavelka believed Joan should have received based on the bidding agreement. Thomas admitted that he had refused to turn over the 2015 CRP payment due to Joan under the bidding agreement (item G26 valued at $3,905.15 in property statement and decree).

Joan argues that the 2014 CRP payments should be included as a marital asset awarded to Thomas as they were "clearly an asset generated by the marital estate during the marriage and during a time that . . . Pavelka was managing the farm for the parties pursuant to a court order." Brief for appellant at 35. Joan argues that if this court declines to include the 2014 CRP payments kept by Thomas in the marital estate, we should treat the parties similarly and exclude the value of item G26 from Joan's marital assets in the property settlement. Thomas concedes that the 2015 CRP payment should have been placed on his side of the balance sheet as it was in his possession and was owed to Joan. He argues, however, that any error on the district court's part was due to the fact that Joan listed it on her side in the property statement. We also note that at the hearing on the parties' postdecree motions, Joan argued that item G26 should be an asset on Thomas' side of the balance sheet; however, the court declined to make any change to the treatment of this item in the January 2018 order.

Although Joan's treatment of the 2015 CRP payment in the property statement and in her argument at the hearing on the postdecree motions undoubtedly contributed to the district court's differing treatment of the 2014 and the 2015 CRP payments, we agree with Joan's assertion on appeal, that these payments should be treated consistently. We find that the CRP payments for 2014 and 2015 are properly considered postfiling assets and not part of the marital estate. Accordingly, we modify the court's January 2, 2018, order to exclude $3,905.15 from Joan's side of the marital estate and, as set forth below, have adjusted the equalization payment due from Joan

to Thomas accordingly. However, we also find that this amount was due to Joan pursuant to how they divided the real property under the bidding agreement and was retained by Thomas. Accordingly, we give Joan a credit for $3,905.15, which is subtracted from the amount of the adjusted equalization payment, and we modify the January 2 order in that regard as well.

### (iv) MF Global Investment Settlement

"MF Global Investment Settlement" was listed in the "**MISCELLANEOUS**" category on the joint property statement as an asset in Thomas' possession for which Thomas gave "[n]o cash value" and Joan stated the value as "[u]nknown-H failed and refused to disclose information." The district court identified this item in the decree as a marital asset awarded to Thomas at "[n]o cash value."

Joan argues that the district court's valuation was contrary to the evidence. At trial, she testified, "MF Global was a company that we did hedging or marketing with of grain, and MF Global went bankrupt and so there was an outstanding legal case against MF Global. And we had requested information from [Thomas] on this, but we never received that." She testified further that she obtained information that there was a settlement payment coming to Thomas but never received any information about that. Joan also notes information in an exhibit containing Thomas' answers to certain interrogatories that reflects receipt of $18,249.29 in "hedging gain" from "MF Global." Joan argues that the court should have used the value reflected in this exhibit. Thomas argues, however, that Joan "is attempting to double dip," as this asset was already included in the marital estate under a different name. He notes the court's award to him of "RJ O'Brien FuturesOne Investments" at a value of $18,248. This item was also included on the joint property statement in the "**LIFE INSURANCE, INVESTMENTS, AND RETIREMENT PLANS**" category, where both parties valued it at $18,248. Thomas argues, "MF Global was bought up by R.J. O'Brien, and that asset was properly included in the marital estate." Brief for appellee at 39. Thomas does not direct us to any testimony supporting this assertion, and we have found no evidence confirming that these separate entries on the property statement and the decree represent the same asset. On the other hand, the record does not support Joan's assertion that they are not the same asset.

We find no abuse of discretion in the court's decision to award "MF Global Investment Settlement" to Thomas at the value represented by Thomas on the property statement.

### (v) Dirt Removal

Joan's arguments concerning dirt removal involve Thomas' alleged dissipation of marital assets by his removal of dirt from one of the quarter sections of property she won under the bidding agreement. During Pavelka's tenure as farm manager, Joan contacted him with concerns about "some significant amount of dirt that was being excavated from this pivot corner" by Thomas on one of her quarter sections. Some of the dirt was used by Thomas "for repair of the farmstead a half mile down the road," while some of it was taken to the site of a machine shop building that was being constructed by other individuals. Joan contacted several businesses to help determine the value of the dirt removed. One company prepared an elevation report, and another company gave a quote as to the value of the removed dirt. Joan based her valuation of the dirt in the property

statement on these documents, but neither was received into evidence by the court. Joan was allowed to testify over Thomas' hearsay and foundational objections as to her opinion of the value of the dirt, which she stated was $12,159, but the court stated that if her opinion was "based solely on a hearsay document," it would have to strike it. Joan later testified that her opinion was based solely on the two excluded documents.

Joan argues that by removing the dirt, Thomas dissipated a marital asset that should have been valued and included in the marital estate. See *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009) (marital assets dissipated by spouse for purposes unrelated to marriage should be included in marital estate in dissolution actions). Thomas argues that Joan did not prove the value of the dirt since her exhibits were not received into evidence and that the correct valuation would have been based on the difference in the value of the land with and without the dirt, rather than on the value of the dirt itself. The dirt was identified in the amended joint property statement as a marital asset dissipated by Thomas, which he valued at $0 and Joan valued at $12,159. In the decree, the district court identified it as item G18, assigned to Thomas at a value of $0. The court included the dirt in the marital estate and awarded it to Thomas at no value. We find no abuse of discretion.

*(vi) Farm Operating Loan*

The district court gave Thomas a credit of $191,075 for what was identified in the amended joint property statement and the decree as item I2 and described as "Farm Operating Loan from 8-14-2013 through 12-1-2013 - paid by [Thomas] on 1/15/2014 and 2/7/2014." Joan argues that Thomas should not have received this credit because the loan represented by item I2 did not exist at the time she filed this action. In support of her argument, Joan references an operating note in the amount of $192,075 that was paid off in January 2013. She also notes that marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). The burden to show that a debt is nonmarital is on the party making that assertion. *Id.*

When asked about item I2 at trial, Thomas testified that it represented a new loan he took out on August 14, 2013, with a balance of $191,075, which he used to pay expenses to finish out the 2013 crop year, and that he wanted to be credited for that amount. Thomas also testified that prior to his receipt of the complaint for dissolution of marriage, Joan withdrew money out of a farm operating account, which caused him difficulties. According to Joan, she withdrew $180,000 from the operating account and deposited it in her savings account because she believed she was entitled to half of what was in the account at that time. Thomas testified that after Joan's withdrawal, he had a check that bounced and the farm account was shut down for a few days. Thomas indicated that he had to go to the bank and take out another operating loan. An examination of exhibit 203 shows a series of principal advances and payments between August 23, 2013, and February 7, 2014. The principal balance as of October 21, 2013, was $191,075, and the principal balance had returned to $0 by February 7, 2014.

Thomas argues that item I2 was properly included in the marital estate as it was incurred to complete harvest of the 2013 crop, which was a marital asset. The district court clearly credited Thomas' testimony as to how and for what the funds from item I2 were used, and we agree that

- 14 -

under the circumstances of this case, giving Thomas a credit for the amount of debt incurred to harvest the 2013 crop was proper. We find no abuse of discretion.

*(vii) Income Tax Liability*

Joan complains of two credits Thomas was given for income tax liability. She first complains of item J17, the credit of $ 153,016 given to Thomas by the district court for "Anticipated taxes for 2013 grain sold in 2014." She also complains of item J18, the credit of $95,364 given to Thomas for "State & Federal Income Taxes paid solely by [Thomas]." Joan argues that neither item should have been included in the marital estate because Thomas did not actually incur or pay either of these amounts.

We first address the district court's inclusion of item J17 in the marital estate. The evidence regarding this item came primarily from the parties' accountant. The accountant prepared exhibit 203, entitled "TOM AND JOAN ALBERTS Property Settlement Summary," based on his examination of the parties' tax returns, bank information, and the amended joint property statement. The accountant looked primarily at 2013 in an effort to equally allocate the income and debts between the parties.

The accountant testified that some of the grain crop raised by the parties in 2013 was carried forward into 2014 and sold at that time, which proceeds he calculated at $450,040. In its property division worksheet, the district court noted item G3, 2013 corporate grain proceeds, and included $440,747.23 as 2013 grain sold in 2014 on Thomas' side of the ledger. We note that while exhibit 203 shows total grain sale deposits for the 2013 crop in 2014 of $450,073.16, this includes deposits totaling $9,325.90 from "CHS" and "USDA", which the district court apparently excluded in its determination of the amount of 2013 grain sold in 2014.

The accountant included a deduction in exhibit 203 of $153,016 for estimated deferred income taxes on 2013 crop sales proceeds reported as taxable income in 2014, which is the amount of debt assigned to Thomas by the district court at item J17. The accountant testified he computed the estimated tax based on 34 percent of the $450,000 plus of grain proceeds for 2013 grain sold in 2014.

The accountant agreed that this was not the tax liability that was actually incurred by either Thomas or the farm corporation in 2014 because Thomas was able to offset some of the tax liability with a significant amount of operating expenses in 2014, which expenses were Thomas' separate responsibility and not considered as part of the property division. The accountant assumed, for purposes of valuing the marital estate, that the "cut off" date was December 31, 2013, and that the tax liability associated with the 2013 grain proceeds realized in 2014 had to be included in the allocation.

Thomas notes that income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus, income tax liability should generally be treated as a marital debt. *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001). See, also, *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995) (holding that to consider income tax ramifications of IRA and Keogh accounts, credible evidence must be presented as to what tax ramifications associated with accounts will be in future); *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988) (holding that income tax consequences associated with IRA was proper

- 15 -

consideration in determining present value of account since income tax would have to be paid eventually). Thomas argues since most of the marital estate was valued through the 2013 growing season, anticipated taxes for the 2013 grain that was sold in 2014 or later was appropriate. He argues further that regardless of how the tax liability was eventually incurred or offset, the district court had to determine a value for the 2013 grain, sold in 2014, as an asset, and he observes that courts are allowed flexibility in their treatment of stored and growing agricultural crops to account for the equities of the situation. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). The evidence adduced by the accountant supports the tax liability offset for the sale of grain raised in 2013 and sold in 2014, which gross proceeds were included as an asset awarded to Thomas, and we find no abuse of discretion.

With respect to item J18, Joan refers to Thomas' 2013 personal income tax return, which shows that his federal liability was $78,786 and his state liability was $16,578, totaling $95,364, which was the amount of credit given by the district court. Joan argues that most of Thomas' income reflected in these returns is reported from schedule E, but that the entirety of schedule E is not included in the exhibit containing the tax returns so the exhibit does not include information about the source of the income. She argues that the inclusion of income taxes when the source of the income cannot be substantiated is an abuse of discretion. She argues further that although her 2013 income tax returns were received into evidence, the district court failed to award her a similar credit for the $13,535 in 2013 income taxes she paid. We note that the amount actually owed by Joan was $2,743. She argues that Thomas' decision to sell crops prior to yearend 2013 increased his income and resulting tax liability and that she should not be penalized for his poor tax planning choices. Thomas argues that his tax liability in this regard was tied directly to the consequences of Joan's unauthorized withdrawal of $180,000 from the corporate account and an unauthorized non-shareholder transfer of $21,691 to pay for credit card personal expenses. Thomas argues that these funds would have been used for crop expenses, but that he was instead forced to sell 2013 grain early in order to cover those expenses, creating taxable income he otherwise would not have had in 2013.

The accountant was asked whether the $180,000 withdrawal by Joan "create[d] problems" for the farm corporation and Thomas. He testified that it may have by putting Thomas in a position where he "sold 2013 grain [in 2013] that he may have otherwise carried forward into 2014 and sold." In addition, the accountant indicated that Thomas prepaid 2014 expenses in 2013 in the sum of $150,000 in an effort to minimize his 2013 tax liability. The accountant confirmed that Thomas sold grain at the end of 2013 to offset Joan's withdrawals in order to carry on the functions of the farm corporation that in turn, created a tax liability that had to be paid. The accountant assumed that the funds withdrawn by Joan would have otherwise been used for crop expenses and that Thomas would not have been required to sell grain at the end of 2013 or prepay 2014 expenses to offset the 2013 income generated by the early sale.

Thomas was awarded as an asset in the property division the 2013 corporate grain proceeds in the sum of $192,611.69, which the court noted was from the 2013 tax return. He was also assigned as an asset the $150,000 in 2014 prepaid expenses discussed above. Therefore, we find no abuse of discretion in the court's inclusion of Thomas' 2013 income tax liability, item J18. Nevertheless, we agree that the parties should have been treated consistently with respect to their

2013 income tax liability. We modify the court's January 2, 2018, order to place a credit of $2,743 ($2,725 federal and $18 state), the amount of liability shown on Joan's 2013 personal income tax return, on Joan's side of the marital estate balance sheet.

(b) Valuation and Division of Marital Property

*(i) Insurance Proceeds*

Joan argues that the district court erred in excluding evidence regarding insurance proceeds and Thomas' misuse thereof and in failing to address the issue of insurance proceeds and how they were spent.

In the decree, the district court stated that it had erred in receiving exhibits 168, 169, 179, and 210, which include documents that were received by the parties from the insurance company relative to tornado damage claims and payments and related documents prepared by Joan. The court initially excluded exhibit 168 from evidence based on Thomas' hearsay objection. Thomas objected to Joan's offer of exhibit 169 on relevance and foundation and asked to voir dire her about its creation. Thomas offered exhibit 210 during his voir dire of Joan, which was received at that time. When Joan reoffered exhibit 169, Thomas again objected on the basis of relevance, which objection was taken under advisement by the court. Exhibit 179 was initially received without objection. Some of these rulings were revisited on a subsequent day of trial, when the court announced its intent "to reverse its ruling with respect to exhibit 168 and receipt under the residual hearsay exception." Thomas withdrew his objections to exhibits 168 and 169 during that discussion, and both of those exhibits were received by the court. The court also indicated during this discussion that exhibit 210 had been received. And, as indicated, the court reversed its ruling in the decree and indicated that it had erred in receiving all four of these exhibits, which Joan argues was error. We address this argument in the context of addressing Joan's other arguments about insurance proceeds.

With respect to insurance proceeds, Joan first argues that the district court erroneously awarded her item G23, identified in the decree as "Insurance proceeds (Included in bidding process but not turned over by H)" and placed on Joan's side of the marital estate at a value of $17,889. In the amended joint property statement, where these proceeds were identified as item G24, Thomas valued them at $20,304; Joan valued them at $17,899. At the hearing on the parties' postdecree motions, Joan argued that item G23 was insurance proceeds that continued to be in Thomas' possession and should not have been an asset on Joan's side of the balance sheet. The court declined to change that award in its January 2018 order, citing "Exhibit 83 [property statement], testimony of Tom." While the tornado damage insurance proceeds were initially administered by the farm manager, at some point he turned them over to Thomas pursuant to the court's order. Joan testified that at the time she entered into the bidding agreement Thomas told her that there was $17,889 left in insurance proceeds. Thomas testified about his use of the insurance proceeds, and he indicated that there were still repairs that needed to be done on the inside of the house. Joan argues that Thomas has claimed that she owes him some of those proceeds back for repairs he made to the property, either in excess of or in addition to insurance monies. She argues further that presumably, that is why the court ordered her to pay the $17,889, but she asserts it is clear that Thomas had control of these funds and had never turned them over to her. Finally, Joan argues

- 17 -

that it is equally clear that Thomas misspent and dissipated the proceeds on items that were not covered under the policy. She concludes that there is no rational reason that she should be awarded, as an asset, insurance proceeds held and kept by Thomas during the pendency of this case. We agree that item G23 should be moved from Joan's side of the balance sheet to Thomas' side, and we have modified the court's January 2, 2018, order accordingly.

Joan also argues that Thomas either misspent or over-spent the insurance proceeds by $53,662.79 and that the district court should have required him to repay this amount. She argues that the receipt of the insurance documents was relevant to this claim. We note that the court appears to have received exhibit 190, a document in which Joan summarized certain information about the insurance proceeds and in which she claimed Thomas had $53,662.79 in insurance proceeds, which were "due to Joan per Bidding Agreement." In her reply brief, Joan again argues that the receipt of exhibits 168, 169, 179, and 210 were "relevant to the Court's determination regarding several items on the Joint Property Statement, specifically, item G19, and whether Tom owes Joan or the marital estate $53,662.79 as a result of his over-expenditure of insurance proceeds for uncovered items and expenditures." Reply brief at 9. She argues further in her reply brief that the court erred in reversing its ruling on these exhibits and in "failing to make any finding regarding the issue of the insurance proceeds, G19, to the detriment of Joan in the amount of $53,662.79." *Id.* Contrary to Joan's assertion, item G19 on the property statement was her claim for dissipation of marital assets for removal of dirt from one of the properties she won under the bidding agreement. The property statement does not include an entry corresponding to Joan's claim for $53,662.79 in misspent insurance proceeds. We find no abuse of discretion in the court's failure to address this claim and decline to address it or Joan's evidentiary arguments further.

*(ii) Funds Withdrawn to Pay Bank of America Card*

In the decree, the district court assigned item G9 to Thomas as an asset. This item, valued at $21,691, represents funds withdrawn in July and August 2013 from the corporate farm account to pay the Bank of America credit card, which was in Joan's name. In the postdecree order, the court removed this item from Thomas' side of the ledger and added it as an asset to Joan's side. Despite arguments made at the hearing on the parties' postdecree motions upon which the court apparently made this adjustment, Joan argues on appeal that the court erred in assigning this item to her as an asset. Specifically, she argues that the court erred in "determining that the value of the withdrawal from the parties' corporate account to pay for bills incurred for a family vacation and other expenses incurred during the marriage should be assigned as an asset to Joan." Brief for appellant at 45.

The parties' accountant testified about this withdrawal from the corporate account, indicating that Joan originally classified it as equipment rental instead of personal expenses in the farm bookkeeping. The accountant testified that this withdrawal was not a deductible item and had an impact on the tax liabilities for 2013, and he indicated that Joan paid these personal expenses out of the corporate account despite being aware that she should not have done so. To rectify the bookkeeping entry, the accountant removed the sum from deductible expenses, and treated it as "an unauthorized advance to non-stockholder, non-deductible," which "shows up as an asset on the balance sheet of the Thomas Alberts Farms."

- 18 -

Joan testified that in the past, she had paid the Bank of America credit card out of the farm account, and she did not think her payment of "that account from the farm account for these two statements" was a problem. Joan testified that the credit card debt was used to benefit the entire family in the 2 months prior to the divorce. Thomas acknowledged that some of the charges on the Bank of America card for the months of June and July 2013 were used for marital purposes including a trip taken by the entire family.

We note that item G9 was listed on the parties' amended joint property statement (where it is identified as item G10) as an asset in Joan's possession. On exhibit 83, in the column for "H PRESENT VALUE" it is valued at $21,691; in the column for "W PRESENT VALUE" it states "Accounted for in Corporate Checking Balance." As noted above, the court initially awarded item G9 as an asset to Thomas, but moved this asset to Joan's side of ledger pursuant to her attorney's request at the hearing on the parties' postdecree motions. At the hearing, her attorney observed that the court "obviously considered [G9 a] personal expense" and argued, "Those should be an asset to [Joan] and not an asset to [Thomas], so I have included a deduction from [Thomas'] side of the balance sheet and an addition to [Joan's] side of the balance sheet." And, this is exactly the change made by the court in its January 2018 order ruling on the parties' postdecree motions.

Despite item G9 being identified as a marital asset in the parties' property statement and in Joan's arguments at the time of the hearing on the postdecree motions, she is now arguing that item G9 should not have been included in the marital estate at all. However, a party cannot complain of error which the party has invited the court to commit. *In re Estate of Karmazin*, 299 Neb. 315, 908 N.W.2d 381 (2018). We find no abuse of discretion in the district court's treatment of item G9 and decline to make any further adjustment to this item.

*(iii) Pinnacle Bank Debt*

Joan presents several arguments concerning item H1, the parties' debt to Pinnacle Bank that was secured by the four quarter sections of real property. The division of the land and the debt secured by the land was addressed by the parties' pretrial bidding agreement. Pursuant to the bidding agreement, Thomas was to receive the premarital quarter section of land and the remaining three quarter sections were to be bid on by the parties according the process outlined in the agreement. With respect to debt, the agreement provided:

> The debt on the land/equipment shall be divided into four quarters. One quarter of said debt shall be given to Thomas with his premarital quarter section. The remaining three quarters of debt shall go with each of the three quarter sections to be bid on by the parties. The party receiving a quarter shall receive one quarter of the debt. Thomas shall receive a credit for the debt he takes with the premarital quarter section when it comes to equalization. Current principal balance of debt $434,190.35. Interest on this loan will be paid 50/50 by both parties to be current on December 31, 2014.

During the bidding process, Joan won the other three quarter sections and was placed in possession of that property; Thomas retained possession of the premarital quarter section. In the decree, the district court awarded the quarter sections pursuant to the results of the bidding process, assigning the marital portion of the value of the premarital quarter section to Thomas and the remaining three

quarter sections to Joan. With respect to item H1, the court assigned the entire debt to Thomas at a value of $485,782.53. At the hearing on the parties' postdecree motions, Joan offered and the court received her affidavit showing that she had made payments of principle and interest on the debt totaling $151,263.79, arguing that she should be given credit for having reduced the total debt by this amount. In its order ruling on the postdecree motions, the court made an adjustment adding $127,595.79 to Thomas' side of the net marital estate (representing the amount of principle payments made by Joan toward the H1 debt).

On appeal, Joan first argues that pursuant to the parties' pretrial bidding agreement, three-fourths of the total of H1 ($325,642.76) should have been assigned to her and the remaining fourth of H1 ($108,547.59) should have been awarded to Thomas. She also argues that the district court should have reduced the total value of H1 by $151,263.79 (the total amount of principle and interest paid by Joan) rather than reducing it by only the amount of principle she paid. Joan argues that the court's treatment of H1 had a substantial impact on the amount of the equalization payment she was required to pay.

Thomas argues that while the district court's decision to award him the entire debt represented by item H1 may have been inconsistent with the parties' bidding agreement, it was not an abuse of discretion. He points out that the indebtedness was a single loan secured by all four quarter sections and that dividing the debt would have required refinancing. The court's award of the debt to him as opposed to Joan, simply means that Joan will owe some amount of equalization payment to Thomas as opposed to owing a loan amount to the bank. And, Thomas points out that the parties were each awarded sufficient assets to pay this debt. Thomas states that while he "would have preferred that Joan assume the liability on that debt," he "accepts the determination of the trial court as equitable under the circumstances." Brief for appellee at 38. With respect to Joan's argument that she should have also received credit for her interest payments toward the debt while the case was under consideration, Thomas argues that Joan received the benefit of the cash rent on those properties during the proceedings and to allow her to receive credit for the interest payment would provide her with interest free financing at his expense. He also asserts that a failure to give Joan credit for her interest payments totaling $23,668 is not an abuse of discretion given that as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

We find no abuse of discretion in the district court's decision to award the entire amount of H1 to Thomas. The debt will undoubtedly need to be refinanced regardless, given that Thomas no longer owns three of the quarter sections. The court's award of the debt to Thomas was equitable under the circumstances. We also find no abuse of discretion in the court's determination that Joan should be given credit for only the amount of principle she paid toward this debt during the pendency of the case.

(c) Equalization

As set forth above, we modify the district court's January 2, 2018, order in the following regards: (1) We exclude $3,905.15 (value of item G26, the 2015 CRP payment) from Joan's side of the marital estate and adjust the equalization payment due from Joan to Thomas accordingly.

We also give Joan a credit for $3,905.15, which is subtracted from the amount of the adjusted equalization payment. (2) We give Joan a credit of $2,743 on her side of the marital estate for the total amount of liability shown on her 2013 personal income tax return. (3) We move item G23, $17,899 in insurance proceeds retained by Thomas, from Joan's side of the balance sheet to Thomas' side.

Our adjustments to the district court's January 2, 2018, order are shown in the following chart:

|  | Thomas | Joan |
| --- | --- | --- |
| Net marital estate before postdecree adjustments | $ 555,263.36 | $5,238,590.89 |
| Postdecree adjustments | 31,958.92 | 31,247.62 |
| Net marital estate after postdecree adjustments | 587,222.28 | 5,269,838.51 |
| Adjustment for G26 | | (3,905.15) |
| Joan's 2013 tax liability | | (2,743.00) |
| G23 insurance proceeds | 17,899.00 | (17,899.00) |
| Totals appeal adjustments | 605,121.28 | 5,245,291.36 |
| Appeal equalization | 2,320,085.04 | (2,320,085.04) |
| TOTALS | $2,925,206.32 | $2,925,206.32 |
| Credit for G26 added to Joan's equalization | | $3,905.15 |
| FINAL EQUALIZATION | | ($2,316,179.89) |

Accordingly, Joan is ordered to pay Thomas an equalization payment of $2,316,179.89, and we modify the court's order to reflect that change.

### 3. ATTORNEY FEES

With respect to the district court's award of attorney fees, Joan assigns two errors: she asserts that the court erred in allowing Thomas to withdraw his rest and offer further evidence more than 2 months after the case was taken under advisement and ordering Joan to pay $20,000 to Thomas for attorney's fees.

### (a) Offer of Additional Evidence

The final day of live testimony in this case was April 13, 2016. The record was held open for the receipt of the deposition from an out-of-state witness, which was submitted to the district court at a telephonic hearing held on June 1 (court took the offer under advisement and received the deposition in the decree). Thomas's motion for leave to withdraw his rest in order to submit 2015 income tax information as well an attorney fee affidavit was heard by the district court on August 5, 2016. Following argument by the parties, the court granted Thomas' motion, as well as Joan's request to submit an attorney fee affidavit, and arranged for the provision of Joan's 2015 tax information to Thomas. The bill of exceptions for the August 5 hearing does not show the actual offer and receipt of any exhibits at that time.

Among factors traditionally considered in determining whether to allow a party to reopen a case to introduce additional evidence are (1) the reason for the failure to introduce the evidence, i.e., counsel's inadvertence, a party's calculated risk or tactic, or the court's mistake; (2) the

admissibility and materiality of the new evidence to the proponent's case; (3) the diligence exercised by the requesting party in producing the evidence before his or her case closed; (4) the time or stage of the proceedings at which the motion is made; and (5) whether the new evidence would unfairly surprise or unfairly prejudice the opponent. *Frederick v. City of Falls City*, 295 Neb. 795, 890 N.W.2d 498 (2017).

On appeal, as she did at the hearing on Thomas' motion, Joan argues that Thomas' attorney fee affidavit was marked but not offered as an exhibit at the final trial hearing and that Thomas never offered any evidence as to attorney fees on the final day of trial. She argues, "It is fundamentally unfair for the trial court to allow [Thomas'] oversight in addressing the attorney fee issues to be addressed months after he had rested." Brief for appellant at 48. She also argues that there is no record of "what was offered or of the affidavit used to award the attorney fees." *Id.* Thomas points out that there were several outstanding matters following the final day of trial, including the review and submission of text messages from Isaac's phone and the deposition of the out-of-state witness. He also notes that the parties submitted lengthy closing arguments for the court's consideration.

Both parties requested attorney fees in their pleadings. This was a lengthy and complicated trial, and as noted by Thomas, additional work remained to be completed by the parties' attorneys following the last day of live trial testimony. Finally, Joan was given the same opportunity as Thomas to submit an attorney fee affidavit. The district court did not abuse its discretion in allowing Thomas to withdraw his rest or in allowing the parties' to submit attorney fee affidavits.

(b) Award of Attorney Fees

With respect to district court's order requiring Joan to pay $20,000 of Thomas' attorney fees, Joan argues that in a dissolution action for an estate worth over $5,000,000, it is unclear why the court awarded attorney fees. She argues further that the parties each had significant wealth and could afford to pay their own fees and that there was no prevailing party.

A party may recover attorney fees and expenses in a civil action only when a statute permits recovery or when the Nebraska Supreme Court has recognized and accepted a uniform course of procedure for allowing attorney fees. *White v. White*, 296 Neb. 772, 896 N.W.2d 600 (2017). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Thus, there was authority, in this dissolution action for awarding attorney fees. The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018).

The parties' attorney fee affidavits do not appear to have been included in the massive record on appeal (we have not located them in our review of the record and the parties do not direct us to these documents in their briefs). However, this was clearly a complex and lengthy dissolution action, involving a large marital estate, questions of whether premarital property had been

converted to marital property, issues relating to the tornado damage, as well as the vast amount of medical and other expert evidence presented to help the district court determine issues relating to the children. Thomas was awarded sole legal custody and succeeded in obtaining joint physical custody. He also prevailed on various issues relating to the determination and division of the marital estate. The district court did not abuse its discretion in ordering Joan to pay $20,000 of Thomas' attorney fees.

## VI. CONCLUSION

The district court did not abuse its discretion in awarding sole legal custody of Isaac to Thomas, and an award of joint physical custody was in his best interests. We have modified the court's determination of marital property and its valuation and division of the marital estate as set forth above. The court did not abuse its discretion in allowing Thomas to withdraw his rest to submit an attorney fee affidavit or in ordering Joan to pay $20,000 to Thomas for attorney fees.

AFFIRMED AS MODIFIED.